**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                                    No. 98-4401

MAHMOUD HASSOUNEH,
Defendant-Appellant.

Appeal from the United States District Court
for the Middle District of North Carolina, at Durham.
James A. Beaty, Jr., District Judge.
(CR-97-268)

Argued: October 29, 1999

Decided: January 13, 2000

Before WILKINS and WILLIAMS, Circuit Judges,
and BUTZNER, Senior Circuit Judge.

_____

Vacated and remanded by published opinion. Judge Williams wrote
the opinion, in which Judge Wilkins and Senior Judge Butzner joined.

_____

**COUNSEL**

**ARGUED:** Walter Lamar Jones, CLIFFORD, CLENDENIN,
O'HALE & JONES, L.L.P., Greensboro, North Carolina, for Appel-
lant. Michael Francis Joseph, Assistant United States Attorney,
Greensboro, North Carolina, for Appellee. **ON BRIEF:** Walter C.
Holton, Jr., United States Attorney, Greensboro, North Carolina, for
Appellee.

_____

**OPINION**

WILLIAMS, Circuit Judge:

Appellant Mahmoud Hassouneh appeals his conviction for falsely stating that there was a bomb in the bag he sought to place aboard a civil aircraft. Hassouneh was prosecuted under 18 U.S.C.A. § 35(b) (West Supp. 1999), a felony provision, which requires the Government to prove that an offender acted "willfully and maliciously, or with reckless disregard for the safety of human life." Id. Hassouneh appeals his conviction on the ground that the district court improperly instructed the jury on the meaning of "willfully and maliciously." In addition, Hassouneh asserts that he was improperly prevented from presenting evidence relevant to showing that he did not act maliciously. Because we agree with Hassouneh's arguments that the district court failed adequately to instruct the jury on the meaning of "maliciously," as used in § 35(b), and erroneously prevented him from presenting evidence relevant to his defense, we vacate his conviction and sentence and remand for a new trial.

I. FACTUAL BACKGROUND

A little before 7:00 a.m. on Saturday, November 15, 1997, Mahmoud Hassouneh arrived at North Carolina's Piedmont Triad Airport, in Greensboro, intending to fly to Orlando, Florida to attend his cousin's wedding. It was the first day off from work that Hassouneh, a small convenience store owner, had taken in four years. Hassouneh's AirTran Airways flight was scheduled to depart at 8:20 a.m., and shortly after 7:00 a.m. he approached the ticket counter for AirTran Airways where he was greeted by two airline employees, Amy Havas and Vanessa Nguyen.[1] Hassouneh presented Havas with his AirTran ticket to Orlando and his driver's license. Havas then asked Hassouneh if any unknown person had asked him to carry anything on board the airplane. Havas testified that Hassouneh responded, "Well, there were some either Iraqi or Irani[an] . . . men outside who gave

---

[1] AirTran Airways contracted Continental Airlines to check-in and load the bags of AirTran passengers flying out of Piedmont Triad Airport. Havas and Nguyen were employed by Continental Airlines and were responsible for checking in passengers on AirTran flights.

2

me a bomb to put in my bag." (J.A. at 14.) Nguyen similarly testified that she heard Hassouneh state that two men had given him a bomb to carry. According to Havas, Hassouneh appeared "serious but kind of lighthearted," (J.A. at 14), and was laughing and chuckling a little when he made the statement. Havas escorted Hassouneh over to a security area to run his bag through an x-ray machine. On the short walk over to the security area, Havas informed Hassouneh that "it is a federal offense to make jokes about bombs in bags," to which Hassouneh allegedly replied, "You need to lighten up. It's just explosives." (J.A. at 15.) Havas testified that she suggested to Hassouneh that he not say anything more, but Hassouneh continued to answer, "It's just a bomb." (J.A. at 15.)

Upon reaching the security area, Havas turned Hassouneh over to Martha Hairston, a security officer. Security personnel ran Hassouneh's bag through the x-ray machine, but discovered nothing that looked like a possible bomb. Hairston testified that she said to Hassouneh, "Sir, are you telling us that you have a bomb in that bag?" (J.A. at 51.) According to Hairston, Hassouneh answered: "I have nothing in there but explosives." (J.A. at 51.) Hairston then placed the bag back in the x-ray chamber for additional examination and kept it there. Unable to confirm that no explosive device was inside the bag, Hairston called in the police to examine further the contents of the bag. Hairston testified that Hassouneh was smiling during her brief encounter with him.

A police officer with the Piedmont Airport Authority arrived at the security area and questioned Hassouneh. According to the officer's testimony, Hassouneh told the officer that he had been joking and stated, "This lady must have PMS. They can't take anything here." (J.A. at 76.)

A bomb specialist with the Greensboro Police Department observed the bag inside the x-ray chamber and could not rule out the possibility that it contained an explosive device. The bomb specialist destroyed the bag, although a later inspection revealed that the bag contained no explosives.

The Government also presented testimony from a Continental Airlines supervisor, James Major, concerning the disruption caused by

3

Hassouneh's exploits. Major testified that the airport's entire north concourse was evacuated and the passengers and airplanes were moved to the south concourse for flight departures. The north concourse was closed down for approximately forty-five minutes to an hour. Major also read into evidence an announcement that is played over the airport's public address system every fifteen minutes concerning a passenger's duty to control his baggage. **2**

The Government further introduced evidence that signs are placed throughout the airport advising passengers that it is a federal crime to make false statements concerning carrying explosives aboard an aircraft. There is also a sign built into the ticket counter that informs passengers that it is a federal crime to carry hazardous materials aboard an aircraft.

Following the Government's presentation of its case, Hassouneh sought to introduce character evidence regarding his reputation as a jokester. The district court ruled that this evidence was inadmissible because, in its view, being a jokester was not a defense to the crime, and, thus, this evidence was irrelevant. Nonetheless, the district court allowed Hassouneh to present this character evidence outside the presence of the jury to preserve the record. Hassouneh presented two witnesses in that voir dire examination who testified that they knew Hassouneh well and that he "[told] jokes and laugh[ed] a lot" and was a "kidder." (J.A. at 113, 115.)

_____

**2** The announcement provides:

> May I have your attention, please. May I have your attention, please. Federal Aviation Administration security regulations require all passengers to maintain continual control of all carry-on luggage. Please do not leave any baggage unattended. All baggage is subject to inspection. Passengers are also cautioned not to accept any baggage, package or any items from persons unknown to you. If you are approached by any person asking you to accept any baggage, package or other items, immediately contact the nearest airplane representative, security screening personnel or airport authority police department. Thank you for your attention.

(J.A. at 73.)

4

After the voir dire examination, Hassouneh resumed presenting his defense in open court. Hassouneh, who has lived in the United States since 1979 and is a United States citizen, testified that he had not traveled by air since 1991, when he traveled to his native Jordan. He indicated that he was in the airport for about twenty minutes before he approached the ticket counter. Hassouneh also testified that he had not read any of the signs posted around the airport or at the ticket counter informing passengers of the illegality of carrying destructive devices aboard an aircraft or making false statements about such conduct. In describing the incident that led to his arrest, Hassouneh indicated that his response that there were "a couple of terrorist[s] right outside," (J.A. at 140), was an ill-conceived attempt at a joke. Hassouneh explained in his testimony that when Havas asked him if anyone had approached him to carry anything on board the aircraft he tried to join in the humor: "When I approached that lady at the counter, I thought she was trying to be funny and I thought, you know, a little humor at that hour in the morning was not going to matter so much because everybody appreciates a lighthearted joke." (J.A. at 163.) Hassouneh explained that his attempt to "laugh . . . with them, just right along type of thing" then "escalated" to the point that the police were called in. (J.A. at 142.) When the police arrived, Hassouneh told Officer Harris, "Sir, I was joking here," and attempted to show Officer Harris that there was no bomb in his bag. (J.A. at 163.)

At the close of Hassouneh's case, the district court instructed the jury that "the Government must prove beyond a reasonable doubt that the Defendant acted willfully and maliciously." **3** (J.A. at 214.) The court proceeded to instruct the jury that "[t]he term `willfully' means that the act was committed deliberately and intentionally, as contrasted with being made accidentally, carelessly or unintentionally. The word `maliciously' means that the act was committed intentionally or with willful disregard of the likelihood that damage or injury would result." (J.A. at 214.) Hassouneh previously had objected to the

_____

**3** The Government asked the district court not to instruct on the "reckless disregard for the safety of human life" aspect of 18 U.S.C.A. § 35(b) (West. Supp. 1999) because it was not contained in the indictment and asked the district court only to charge the jury on the "willfully and maliciously" aspect of the statute. The district court accommodated the Government's request.

5

court's definition of "maliciously" in the charge conference, but failed to object to the court's jury instruction concerning "willfully."[4]

The jury found Hassouneh guilty under 18 U.S.C.A.§ 35(b). Hassouneh was sentenced to five years of federal probation and ordered to pay restitution in the amount of $5,788.82 to the Piedmont Triad Airport Authority and AirTran Airways. Hassouneh now appeals his conviction and sentence.

II. 18 U.S.C.A. § 35

We have referred to the statute under which Hassouneh was convicted, 18 U.S.C.A. § 35 (West 1969 & Supp. 1999), as the "Bomb Hoax Act." See United States v. Omirly, 488 F.2d 353, 356 (4th Cir. 1973), abrogation recognized by United States v. Mitchell, 39 F.3d 465, 474 n.11 (4th Cir. 1994) (noting that United States v. Batchelder, 442 U.S. 114, 122 (1979) undermined the basis for the Omirly decision). In its current form, the Bomb Hoax Act provides:

> § 35. Imparting or conveying false information
>
> (a) Whoever imparts or conveys or causes to be imparted or conveyed false information, knowing the information to be false, concerning an attempt or alleged attempt being made or to be made, to do any act which would be a crime prohibited by this chapter or chapter 97 or chapter 111 of this title shall be subject to a civil penalty of not more than

_____

[4] The district court rejected Hassouneh's proposed jury instruction regarding the definition of "willfully and maliciously." His proffered instruction provided, in relevant part:

> In order to establish the offense charged, the evidence must show that the defendant acted willfully, that is voluntarily and intentionally, and with knowledge that the information imparted or conveyed was false.
>
> Furthermore, the evidence must show that the defendant acted maliciously. To act maliciously means to do something with an evil purpose or motive.

(J.A. at 219.)

$1,000 which shall be recoverable in a civil action brought in the name of the United States.

(b) Whoever willfully and maliciously, or with reckless disregard for the safety of human life, imparts or conveys or causes to be imparted or conveyed false information, knowing the information to be false, concerning an attempt or alleged attempt being made or to be made, to do any act which would be a crime prohibited by this chapter or chapter 97 or chapter 111 of this title -- shall be fined under this title, or imprisoned not more than five years, or both.

18 U.S.C.A. § 35. The statute covers the making of false statements about placing a destructive device aboard a civil aircraft. See 18 U.S.C.A. § 32(a)(2) (West Supp. 1999) (statute in same chapter as § 35, prohibiting placing destructive devices aboard civil aircraft).

The Act's felony provision, § 35(b), requires that the perpetrator act "willfully and maliciously" or "with reckless disregard for the safety of human life." Id. Section 35(a), by contrast, contains no comparable scienter requirement and is thus, essentially, a strict liability provision that subjects any person making a false statement, which that person knows to be false, to a $1,000 civil penalty. This dual aspect of the Act plainly evinces an intent on the part of Congress to treat offenders differently depending upon their relative culpability in making the false statement.

This congressional intent is further confirmed by the evolution of the Bomb Hoax Act. Prior to 1961, 18 U.S.C. § 35 did not contain the dual provisions set forth above. The Act was originally enacted in 1956 as a misdemeanor statute. In its initial form the Act provided:

§ 35. Imparting or conveying false information

Whoever willfully imparts or conveys or causes to be imparted or conveyed false information, knowing the information to be false, concerning an attempt or alleged attempt being made or to be made, to do any act which would be a crime prohibited by this chapter or chapter 97 or chapter 111

7

of this title -- shall be fined not more than $1,000, or imprisoned not more than one year, or both.

See United States v. White, 475 F.2d 1228, 1231 n.4 (4th Cir. 1973) (quoting § 35 in its original form). Notably, the Act did not include a felony provision and did not differentiate among offenders -- it required only that a perpetrator act willfully.

In 1961, Congress amended the Act, adding subsection (b), the felony provision, and deleting the word "willfully" from the original 1956 language, now designated subsection (a).[5] These changes clearly indicate a congressional intent to subject anyone who provides false information of the type proscribed in the statute to punishment, but to punish those who make such statements "willfully and maliciously, or with reckless disregard for the safety of human life" more severely. See 18 U.S.C.A. § 35(b). Although we are reluctant to accord much weight to possible motivations for Congress's 1961 amendments, we note that prior to amending the Act, Congress received a recommendation from the United States Attorney General asking for the very changes Congress ultimately enacted. As we explained in detail in our opinion in United States v. White:

> The 1961 amendments were requested by the Justice Department in an Executive Communication from the Attorney General of the United States to the Speaker of the House of Representatives and reasons for the request were assigned:
>
> Our efforts to curb the high incidence of false bomb reports necessarily have included the prosecution of people who claimed they had no intention to create any apprehension or disturbance but

_____

**5** The Act has been subjected to two additional minor amendments since 1961. First, in 1965, Congress replaced § 35(a)'s fine and imprisonment penalty with a civil penalty not to exceed $1,000. See Act of July 7, 1965, Pub. L. No. 89-64, 79 Stat. 210. Then, in 1994, Congress removed a $5,000 fine limit from subsection (b) and allowed a fine "under this title." See Act of Sept. 13, 1994, Pub. L. No. 103-322, 108 Stat. 2147.

were merely playing a practical joke. In prosecuting such individuals, we have taken the position that the word `willfully,' as used in section 35, does not necessarily embrace any evil purpose but comprehends merely a voluntary and conscious imparting or conveying of the false information with which the statute deals. However, the courts have not uniformly adopted our position. Adding to the judicial confusion over the applicability of the statute in prankster cases is the disinclination on the part of jurors to accept our position, resulting in undue acquittals in such cases.

To clarify the statute, and to render it more effective, I submit to the Congress a bill which would make it a felony for one to convey a false report willfully and maliciously, or with reckless disregard for the safety of human life, and a misdemeanor to do so with knowledge of its false character even though without malice or reckless disregard for human life. Such a statute would clearly show the congressional intention to make it a criminal offense to give false reports even without an evil or reckless motive and would provide a more adequate penalty for those whose actions warrant it. (1961 U.S. Code Cong. & Admin. News, p. 3053)

The proposal of the Attorney General as to amendments was adopted in the Senate Report accompanying the bill to amend original § 35.

Sen. Rep. No. 1055, 87th Cong., 1st Sess., 1961; 1961 U.S. Code Cong. & Admin. News, p. 3053:

The committee believes that the proposed legislation, as recommended by the Attorney General and as approved by the House of Representatives, is meritorious and recommends it favorably.

9

> It is apparent from the foregoing quotations that the pur-
> pose of the amendments was to "reshape" the statute to
> eliminate the confusion which had arisen in connection with
> attempts to prosecute pranksters for misdemeanors under
> § 35 as originally enacted. However, the addition of § 35(b)
> was designed to make it a felony to voluntarily and con-
> sciously impart or convey false information with an"evil
> purpose," i. e., willfully and maliciously, or with reckless
> disregard for the safety of human life.

475 F.2d at 1233 n.6 (emphasis omitted).

As we suggested in White, the history surrounding the progression of the Bomb Hoax Act confirms that Congress intended the term "acts willfully and maliciously" to mean "acts with an evil purpose or motive." Furthermore, the statute seems to contemplate that many pranksters whose poorly developed senses of humor lead them to make statements prohibited by § 35 will be subject to the civil penalty now contained in subsection (a), but not to the felony provision of subsection (b).[6]

The Government prosecuted Hassouneh under the felony provision, § 35(b), and, therefore, had to prove that Hassouneh acted with an evil or reckless motive. Because the district court, at the Government's request, did not instruct the jury on the"reckless disregard for the safety of human life" aspect of the statute, the jury was left with the task of determining whether Hassouneh acted"willfully and maliciously."

A. The District Court's Definition of "Maliciously"

Hassouneh's first argument is that the district court improperly instructed the jury on the meaning of "maliciously." We generally review jury instructions under an abuse of discretion standard. See United States v. Bostian, 59 F.3d 474, 480 (4th Cir. 1995). In reviewing the adequacy of the district court's choice of jury instructions, we

---

[6] We do not suggest that a prankster or jokester could not be prosecuted under § 35(b); we simply note that oftentimes such perpetrators will not possess an evil purpose or motive.

10

"accord the District Court much discretion and will not reverse provided that the instructions, taken as a whole, adequately state the controlling law." Teague v. Bakker, 35 F.3d 978, 985 (4th Cir. 1994).

The district court rejected Hassouneh's proffered instruction, which provided that "[t]o act maliciously means to do something with an evil purpose or motive," (J.A. at 219), and instead charged the jury that "`maliciously' means that the act was committed intentionally or with willful disregard of the likelihood that damage or injury would result," (J.A. at 214). The district court's instruction thus allowed the jury to convict Hassouneh under § 35(b) if it found that Hassouneh had acted "intentionally" in making the false statement.**7**

In so instructing the jury, the district court appears to have borrowed its definition of "maliciously" from an Eighth Circuit case. See United States v. Sweet, 985 F.2d 443, 445 (8th Cir. 1993).**8** In Sweet, the Eighth Circuit upheld a district court's instruction concerning the meaning of "maliciously," as used in § 35(b), that defined the word as "an intent to vex, annoy, or injure another or an intent to do a wrongful act. A defendant acts maliciously if she acts intentionally or with willful disregard of the likelihood that damage or injury will result." Id. The Eighth Circuit rejected the appellant's argument that the definition needed also to include an "evil motive or purpose" component. See id.

We recognize that we have cited Sweet's definition of "maliciously," which is consistent with the common law definition, with approval in another context. See United States v. Gullett, 75 F.3d 941, 947 (4th Cir. 1996) (considering the definition of"maliciously" as used in 18 U.S.C. § 844(i)). In Gullet, however, we cautioned that we would "not adopt the common-law meaning of the term if there are `grounds for inferring any affirmative instruction from Congress' to

_____

**7** Because the instruction defined"maliciously" as either "intentionally or with willful disregard of the likelihood that damage or injury would result," (J.A. at 214 (emphasis added)), the jury could have based its decision completely upon Hassouneh's intentional action.
**8** Cases construing § 35(b) have been sparse and, prior to today, no Court of Appeals other than the Eighth Circuit has considered the proper definition of the term "maliciously" as used in this statute.

11

define it otherwise." Id. (quoting Morissette v. United States, 342 U.S. 246, 273 (1952)).

Two primary considerations counsel in favor of declining to apply the portion of Sweet's definition of "maliciously" that the district court chose to apply in this case. First, the district court borrowed only a portion of the Sweet definition and failed to include the added instruction that "maliciously" means "an intent to vex, annoy, or injure another or an intent to do a wrongful act." Sweet, 985 F.2d at 445. Although we do not reach the question of whether such an added instruction would have been adequate, we note that its omission was problematic and distinguishes this case from Sweet. Second, and more important to our decision today, there are considerable grounds for inferring that Congress intended a meaning of "maliciously" different from the common law definition. The clear evolution of the Bomb Hoax Act demonstrates that Congress sought to provide two separate penalties for those who conveyed false information about carrying a bomb aboard a civil aircraft: (a) a misdemeanor, later amended to a civil fine of up to $1,000, for anyone who made such a statement, as long as they knew it was false; and (b) a felony for those who acted with some kind of evil or reckless motive in making such a statement, provided that they too knew it was false. This dual feature of § 35 indicates that the insertion of the words "willfully and maliciously" in subsection (b) is intended to differentiate it from subsection (a). Moreover, if "maliciously" simply meant "intentionally," there would seem to be a redundancy between § 35(a) and § 35(b). We cannot think of a circumstance in which one could violate § 35(a) unintentionally because when one "imparts or conveys or causes to be imparted or conveyed false information, knowing the information to be false," one must act intentionally.

We hold that in light of the dual aspect of § 35's provisions and the readily apparent impetus for the congressional amendments that created this bifurcation, the jury instruction defining the word "maliciously" as "intentionally or with willful disregard of the likelihood that damage or injury would result" did not adequately state the controlling law. We therefore vacate Hassouneh's conviction and sentence and remand the case for a new trial. We note that Hassouneh's proposed instruction, which incorporated an "evil purpose or motive" component, more accurately reflects the proper legal standard neces-

12

sary to convict a person of acting "maliciously" under § 35(b). We also note that other instructions may be equally capable of properly directing the jury on the meaning of "maliciously" under the Act.

B. Character Evidence of Hassouneh's Reputation for Joking

The district court prohibited Hassouneh from presenting evidence of his reputation as a prankster because it did not believe that such evidence was relevant to Hassouneh's defense. We review the district court's decision to admit or exclude evidence under an abuse of discretion standard. See United States v. Bostian , 59 F.3d 474, 480 (4th Cir. 1995).

Because the Government was here required to prove that Hassouneh acted with some type of evil purpose or motive, as discussed above, Hassouneh's argument that his false statements were made in jest is relevant to the extent that his joking negates a finding that he acted maliciously. See Fed. R. Evid. 401. When Hassouneh sought to present evidence of his reputation for jocularity, therefore, the district court erred in excluding this testimony based upon its determination that it lacked relevancy. See Fed. R. Evid. 405(a). We find that this error constituted an abuse of discretion in this case and on remand the district court should allow Hassouneh to present this evidence if he again seeks to introduce it.

C. The District Court's Definition of "Willfully"

Hassouneh also challenges the district court's jury instruction concerning the proper definition of the term "willfully," claiming that here, too, Congress intended that the word's meaning include some type of evil purpose. Hassouneh failed to object to the court's instruction on this ground, and we thus review the court's instruction for plain error. See United States v. David, 83 F.3d 638, 640 (4th Cir. 1996).

The district court defined "willfully" as"deliberately and intentionally, as contrasted with being made accidentally, carelessly or unintentional." (J.A. at 214.) We find that this instruction was adequate. First, Hassouneh's own proposed jury instruction was virtually indis-

13

tinguishable, defining "willfully" as "voluntarily and intentionally." (J.A. at 219.) Second, in the context of 18 U.S.C. § 1001, we have upheld a charge nearly identical to the one the district court gave here concerning the meaning of willfully. See United States v. Daughtry, 48 F.3d 829, 830-31 (4th Cir.), vacated on other grounds, 516 U.S. 984 (1995), on remand, 91 F.3d 675 (4th Cir. 1996). Finally, unlike the term "maliciously," the term "willfully" existed in § 35 in its original, pre-amended form, which clearly did not require any showing of an evil purpose. Moving the word "willfully" into subsection (b) did not create the needed showing of an evil purpose-- bifurcating the statute into two provisions with different penalties and inserting the word "maliciously" in the felony provision generated this enhanced scienter requirement. We thus hold that the district court did not commit plain error in omitting an "evil purpose" component from its definition of "willfully."

D. The Testimony of Major

In addition to the claims addressed above, Hassouneh argues that the district court further abused its discretion in two of its other evidentiary rulings. First, Hassouneh asserts that the district court's admission of evidence concerning the disruption his antics caused in the airport was improper under Federal Rule of Evidence 403.[9] Second, he contends that the district court erred in allowing Major to read into evidence the announcement that is played over the airport's public address system every fifteen minutes when there was no showing that Hassouneh heard the announcement.

"We . . . review a district court's admission of evidence over a Rule 403 objection under a broadly deferential standard," and will not overturn a district court's ruling in the absence of "the most extraordinary circumstances" in which the court's "discretion has been plainly abused." United States v. Love, 134 F.3d 595, 603 (4th Cir.), cert. denied, Sheppard v. United States, 118 S. Ct. 2332 (1998) (internal

_____

[9] Federal Rule of Evidence 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

14

quotation marks omitted). We also review the district court's evidentiary ruling to allow Major to read the public address announcement into evidence under an abuse of discretion standard. See United States v. Bostian, 59 F.3d 474, 480 (4th Cir. 1995). We cannot say that the district court abused its discretion in either of these evidentiary situations.

Evidence of the disruption caused by Hassouneh's shenanigans might have had some relevance to a finding of whether Hassouneh acted "with willful disregard of the likelihood that damage or injury would result," in accordance with the district court's partial definition of the term "maliciously." (J.A. at 214.) It is highly unlikely that the probative value of this evidence was substantially outweighed by its potentially prejudicial effect. In light of our decision to remand this case based in part on the incorrectness of the court's jury instruction defining "maliciously," however, we need not dwell on whether the admission of this evidence was an abuse of discretion.

As for Hassouneh's argument that the public address announcement should not have been read into evidence, we find his contention to be without merit. Hassouneh testified that he had been in the airport for about twenty minutes before he approached the ticket counter. The announcement was read over the public address system every fifteen minutes. This evidence suggests that Hassouneh may have heard a warning not to accept any items from unknown persons, which could lead to a jury finding that he acted maliciously when he subsequently stated that he had been given a bomb. The district court therefore did not abuse its discretion in admitting this testimony.

III. CONCLUSION

We hold that the district court erred in instructing the jury on the meaning of the term "maliciously" in 18 U.S.C.A. § 35(b) (West Supp. 1999). We also conclude that the district court's ruling to exclude evidence of Hassouneh's reputation as a practical joker was in error. We therefore vacate Hassouneh's conviction and sentence and remand this case for a new trial.

VACATED AND REMANDED

15