Filed:  May 16, 2001

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

---

No. 00-4092
(CR-99-201)

---

United States of America,

Plaintiff - Appellee,

versus

Nathan Dante Young,

Defendant - Appellant.

---

O R D E R

---

The court amends its opinion filed April 20, 2001, as follows:

On page 2, second full paragraph, line 7 -- the caliber of the Bersa is corrected to read ".380."

On page 2, third full paragraph, line 9 -- a hyphen is added to correct the page reference to "J.A. 570-72."

On page 4, second full paragraph, line 8 -- a hyphen is added to correct the word to read "cross-examination."

On page 12, footnote 6, line 3 -- the cross-reference is corrected to read "See supra at 8-9."

On page 17, second full paragraph, line 7 -- the phrase is corrected to read "when he told him."

For the Court - By Direction


/s/ Patricia S. Connor
Clerk

PUBLISHED

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                          No. 00-4092

NATHAN DANTE YOUNG,
Defendant-Appellant.

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
T. S. Ellis, III, District Judge.
(CR-99-201)

Argued: December 8, 2000

Decided: April 20, 2001

Before WIDENER, LUTTIG, and MICHAEL, Circuit Judges.

_____

Affirmed by published opinion. Judge Luttig wrote the majority opin-
ion, in which Judge Michael joined. Judge Widener wrote a concur-
ring opinion.

_____

COUNSEL

**ARGUED:** Joseph John McCarthy, DELANEY, MCCARTHY,
COLTON & BOTZIN, P.C., Alexandria, Virginia, for Appellant. Jus-
tin W. Williams, Assistant United States Attorney, OFFICE OF THE
UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.
**ON BRIEF:** Helen F. Fahey, United States Attorney, Alessandra
DeBlasio, Assistant United States Attorney, OFFICE OF THE
UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

**OPINION**

LUTTIG, Circuit Judge:

Appellant Nathan Young was convicted of interstate kidnapping, interstate stalking, and two counts of causing the death of a person through the use of a firearm during and in relation to a crime of violence. For the reasons that follow, we affirm Young's convictions.

I.

On September 13, 1997, the decomposed body of 19-year-old Diana Medina ("Diana") was recovered near an eastbound exit ramp to Interstate 66 in Fauquier County, Virginia. J.A. 633-36. When her body was discovered, she was clothed only in a t-shirt and bra. J.A. 685. The uncontradicted evidence at trial established that on the evening of September 9, 1997, four days prior to the recovery of her body, Diana was shot ten times with a Bersa .380 caliber automatic pistol, dragged by the legs more than 37 feet, and placed behind a tree near a wire fence. J.A. 633, 677, 770.

On the day of the murder, appellant Nathan Young drove Diana from her home in Clinton, Maryland, to her sister's residence in Washington, D.C. J.A. 564-67. When they arrived, Vanida Medina ("Vanida"), Diana's sister, walked up to the passenger-side window of Young's automobile and noticed that there was a gun on the dashboard. J.A. 568. After Vanida inquired about the gun, Young grabbed it off the dashboard and stashed it either in the passenger compartment or on his person. J.A. 570. Diana and Young then accompanied Vanida into her residence to watch a movie. J.A. 570-72. After watching the movie for several minutes, the three decided to go to McDonald's for lunch. As they got into Young's car, Vanida, who sat in the backseat of the car, accidentally knocked over a brown paper bag filled with approximately five boxes of bullets. J.A. 574-76. Young told Vanida that he used the bullets for practice at the shooting range. J.A. 577.

After returning to Vanida's house, the three resumed watching the movie. According to Vanida, Young kept "grabbing [Diana] by her

2

waist and pulling her towards him." J.A. 579. During the course of the afternoon, Diana told Vanida on several occasions that she could not be late to work again. J.A. 580-81. Because Diana had forgotten her work uniform, Young agreed to drop her off at her home in Maryland prior to her shift. J.A. 582. Diana and Young left "a bit after four." J.A. 585. The last time anyone heard from Diana was when she telephoned the shift manager at Ledo Pizza in Clinton, Maryland, shortly before 5:00 p.m. to let him know that she would be late for work. J.A. 611.

The following morning, Young's rental car was found completely engulfed in flames three-quarters of a mile from his grandmother's residence in Prince George's County, Maryland. J.A. 710-11, 724-25. Earlier that morning, Young had filed a report with local police stating that the car had been stolen, a story he later retracted at trial. J.A. 724-25.

Several days following the murder, Virginia State Investigators Carroll S. Miller and Robin Ebersole interviewed Young. J.A. 830. Young changed his story during the course of the interview. Initially, he told agents that after he left Vanida's house, he dropped Diana off near Ledo Pizza sometime between 5:00 and 6:00 p.m. J.A. 834. The agents then specifically inquired as to whether or not the two had engaged in sexual relations. J.A. 836. In response to that question, Young altered his story and explained that rather than immediately dropping Diana off, they had first stopped at his house and unsuccessfully attempted sexual intercourse; according to Young, he was unable to sustain an erection. J.A. 836. Later that same day, Agent Miller arrested Young for the murder of Diana Medina. J.A. 847-48.

The Commonwealth of Virginia subsequently elected to take a nolle prosse on the charges against Young. A little more than a year later, a federal grand jury returned a superseding four-count indictment against him. J.A. 108-13. The indictment charged Young with kidnapping resulting in death, interstate stalking resulting in death, and two counts of causing the death of a person through the use of a firearm during and in relation to a crime of violence. J.A. 108-13.

At trial, the government called Ashon Henderson, Young's longtime friend, as a prosecution witness. During cross-examination,

3

defense counsel asked a series of inflammatory questions suggesting that Henderson was the one who had abducted and murdered Diana. Of particular significance, counsel asked whether Henderson recalled any telephone conversations with Young in the month and a half prior to trial. Henderson responded that he could not recall any such conversations. J.A. 963. Henderson also denied shooting a round through his mattress with the murder weapon on the Sunday following the murder. J.A. 961.

At that point, defense counsel attempted to introduce an audiotape of the conversations between Henderson and Young in order to impeach Henderson. J.A. 968. Defense counsel had not previously provided a transcript or copy of the tape to the government and the government objected, arguing that counsel's conduct violated the court's discovery order.[1] J.A. 974. The district court ruled that introduction of the tape during cross-examination did not violate the discovery order because it was being offered as an impeachment exhibit, not as part of Young's case-in-chief. J.A. 970, 973, 975.

The next morning, however, the district court admonished defense counsel for representing that there was an admission of guilt by Henderson on the tape when "there was no such thing." J.A. 989. While the court allowed defense counsel to play the tape outside the presence of the jury to refresh Henderson's recollection, it did not allow him to play the tape before the jury and limited counsel's impeachment of Henderson to the mattress incident; other statements made by Henderson during cross-examination were not directly contradicted by anything on the tape. J.A. 991.

During defense counsel's continued cross-examination of Henderson, he admitted that he recalled the conversations with Young prior to trial and stated that he remembered discussing the mattress incident, though he believed that the incident occurred months prior to the

_____

[1] The discovery order issued by the district court stated in pertinent part that "[t]he defendant shall permit the Government to inspect and copy or photograph books, papers, documents, photographs, tangible objects, or copies or portions thereof, which are within the possession, custody or control of the defendant and which the defendant intends to introduce as evidence in chief at the trial." J.A. 24.

4

murder. J.A. 1061-62. At the conclusion of Henderson's cross-examination, the government rested.

In a continued effort to have the audiotape played, Young elected to call Henderson as a witness in his case-in-chief. The district court ruled that the tape was inadmissible because it both violated the court's discovery order and did not meet the requirements of Rule 403. J.A. 1299-1301. The district court did allow Young to question Henderson about any matter he wished regarding the tape and even read from the transcript if Henderson's testimony was inconsistent. J.A. 1300.

Nathan Young also took the stand in his own defense. Young testified that on the Sunday following the murder, Henderson confessed to the crime and described the murder to him in graphic detail. J.A. 1218. Henderson told him that he and Diana had had sex, and "[a]fterwards, she wouldn't stop crying." J.A. 1220. Henderson then panicked, grabbed Diana out of the car, and stuffed her in the trunk. J.A. 1220-21. After driving for several hours, Henderson stopped at a dark exit on the side of the road, opened the car's trunk, grabbed Young's gun, and turned on the night sight. J.A. 1221. Henderson told Young that he didn't want to go to jail for the rest of his life for rape, so he shot Diana and "he kept shooting until he thought the clip was empty." J.A. 1221. Henderson then grabbed Diana by the leg and pulled her over to the grass and bushes. J.A. 1222. Henderson disposed of Diana's clothing in some dumpsters in Washington and then burnt the rental car because "when he was obviously raping her . . . he ejaculated on the seat, and he had to get rid of it." J.A. 1223.

At the close of the defense case, the district court denied Young's motion for judgment of acquittal. J.A. 1337. The jury rendered a guilty verdict on all counts of the indictment, J.A. 1493-94, and the district court sentenced Young to life imprisonment on each count. J.A. 1660. Young then filed a timely notice of appeal challenging his convictions. J.A. 1663.

II.

Young argues on appeal that the district court erred in excluding the audiotape of the conversations between him and Henderson. First,

Young contends that the district court abused its discretion in excluding the tape under the Federal Rules of Evidence. Alternatively, Young asserts that even if the tape was inadmissible on evidentiary grounds, due process required that it be played before the jury.

A.

We review the district court's decision to admit or exclude evidence for an abuse of discretion. See United States v. Hassouneh, 199 F.3d 175, 182 (4th Cir. 2000). Young attempted to introduce the tape of the conversations between him and Henderson on two separate occasions during trial. Young first moved that the tape be admitted as impeachment evidence during defense counsel's cross-examination of Henderson in the government's case-in-chief. Later, Young recalled Henderson as a witness in his own case in an effort to admit the tape as substantive evidence of Young's innocence. In both instances, the district court did not abuse its discretion in excluding the tape.

1.

Young contends that the district court erred in denying him the opportunity to play the entire audiotape during his cross-examination of Henderson at trial. The district court rejected defense counsel's argument that the tape in its entirety was probative of Henderson's credibility because only Henderson's statements concerning the discharge of the murder weapon into a mattress were contradicted by any statements on the tape. Though the court found inconsistency in that one area, it nevertheless exercised its discretion and excluded the audiotape, which was being offered as extrinsic evidence of Henderson's prior inconsistent statement.

Fed. R. Evid. 613(b) mandates that certain foundational prerequisites be fulfilled prior to the introduction of extrinsic proof of a prior inconsistent statement.**2** The Rule provides:
_____

**2** Rule 613(b) also mandates that a witness be afforded an opportunity to explain or deny the prior statement, and that the opposing party be permitted to interrogate the witness about such statement. Neither party disputes that these requirements were met in this case.

6

Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require. This provision does not apply to admissions of a party-opponent as defined in rule 801(d)(2).

Rule 613(b) first requires that a prior statement be inconsistent. At trial, Henderson unequivocally denied that he "put a round right through [his mattress]." J.A. 961. That testimony was arguably inconsistent with the following colloquy on the audiotape:

<u>Young</u>: You remember that night back, um, it was like around, it was around that same September and we was up in your joint and <u>you shot a hole up in your bed</u>?

<u>Henderson</u>: <u>Uhm-hmm</u>.

<u>Young</u>: What did you ever do with that bullet, Joe?

<u>Henderson</u>: Threw that s--t away.

<u>Young</u>: Did you keep the bed?

<u>Henderson</u>: Yeah, I still got the bed.

<u>Young</u>: Man, do you realize they can connect the little fragment joints in that bed, back to you having your hands on the joint?

<u>Henderson</u>: Oh, yeah?

<u>Young</u>: Yes. The fragments, they can connect the fragments in her back to the fragments in that bed, and you done, Joe. Between the witness and that -- but they trying to catch you up with the s--t first, and you ain't even know they been trying to do it for weeks.

7

J.A. 1028 (emphasis added). On appeal, Young fails to identify any other material inconsistencies between Henderson's statements on cross-examination and the tape.[3] Therefore, the district court properly limited its inquiry under Rule 613 to the colloquy pertaining to the mattress incident.

Rule 613(b), however, speaks only to when extrinsic proof of a prior inconsistent statement is inadmissible; it says nothing about the admissibility of such evidence. Thus, even if all the foundational elements of Rule 613 are met, a district court is not unequivocally bound to admit any or all extrinsic evidence of a prior inconsistent statement. Rather, a district court may still exercise its discretion to exclude such evidence when its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." See Fed. R. Evid. 403; cf. United States v. Ince, 21 F.3d 576, 580 (4th Cir. 1994) (declaring that when determining whether impeachment evidence is admissible or a "mere subterfuge" to get before the jury substantive evidence which is otherwise inadmissible hearsay, a court must apply Rule 403). Indeed, even if this were not self-evident, our sister circuits have recognized that a district court may continue to exercise its gatekeeping function even though the requisite foundation is laid under Rule 613(b). See United States v. Higa, 55 F.3d 448, 452 (9th Cir. 1995); United States v. Hudson, 970 F.2d 948, 956 n.2 (1st Cir. 1992); Wade v. Haynes, 663 F.2d 778, 783 (8th Cir. 1981); United States v. King, 560 F.2d 122, 128 (2d Cir. 1977).

Here, the district court properly exercised its gatekeeping authority under Fed. R. Evid. 403. In assessing the probative value of the prior inconsistent statement, the district court noted that much of the tape "falls into the category of participating in the conversation and not being probative." J.A. 1011. That observation is especially true with

_____

[3] The district court also found that Henderson's statement that he did not speak with Young a month and a half before trial was contradicted by the existence of the tape itself. J.A. 991. The district court ruled, however, that whether or not the conversations took place was a collateral matter and that a stipulation should be entered if Henderson persisted with his denials of that fact. J.A. 998, 1010.

8

regard to the discussion about the mattress incident since Henderson responded to Young's questions with answers such as "Uhm-hmm" and "oh yeah," which are just as likely to be acknowledgment of the questions as to be an affirmative answer to them.

The district court also considered the risk that the jury would be confused or misled by the tapes. The court correctly noted that the tapes were replete with Young's self-serving hearsay. Such hearsay included, inter alia, Young's fabrication of nonexistent fingerprint and DNA evidence against Henderson, and in the case of the excerpt regarding the mattress incident, a fictitious informant. J.A. 991, 1006, 1011, 1301. Taking into account the low probative value of Henderson's statements, coupled with the confusing fabrications on the tape, we cannot say that the district court abused its discretion in excluding the tape under Rule 403.**4** See United States v. Morlang, 531 F.2d 183, 190 (4th Cir. 1975) (recognizing that the admission of prior statements for impeachment purposes can inject a"danger of confusion").

Moreover, even if the district court had abused its discretion, any error was harmless. See Fed. R. Crim. P. 52(a). After the tape was played outside the jury's presence to refresh Henderson's recollection, the jury returned for the remainder of Young's cross-examination of Henderson. At that time, defense counsel inquired as to whether Henderson recalled "when [Young] asked him if, when he reminded you that [the mattress incident] happened in September, and you shot the bullet, you recall now agreeing with him by saying `Uh-huh'?" J.A. 1062. Henderson then responded, "I said `Uh-huh,' yeah." J.A. 1062. Thus, Henderson impeached himself by categorically admitting that he made the prior inconsistent statement. Once Henderson made that admission, Young accomplished his objective of

_____

**4** While the district court did not explicitly cite Rule 403 in excluding the audiotape during Henderson's cross-examination, it discussed many of the factors that are relevant to a Rule 403 analysis. Because the court made the necessary factual findings and in fact excluded the audiotape on Rule 403 grounds later in the trial, we have no trouble affirming on this ground. Cf. Westberry v. Gislaved Gummi AB, 178 F.3d 257, 262 (4th Cir. 1999) ("[W]e can affirm the evidentiary ruling of the district court on a ground different from that employed below.").

9

impeaching Henderson, and thus undermining his credibility. Therefore, any error in excluding the audiotape during Henderson's cross-examination was rendered harmless. See United States v. Lashmelt, 965 F.2d 179, 183 (7th Cir. 1992) (declaring that any error was harmless when a district court failed to admit extrinsic evidence of a prior inconsistent statement when other evidence achieved the objective of showing the inconsistency); Kines v. Butterworth, 669 F.2d 6, 12 (1st Cir. 1981) (stating that error in excluding a prior inconsistent statement was harmless because it was merely cumulative of the witness' own vacillation on the stand); Williams v. United States, 403 F.2d 176, 179 (D.C. Cir. 1968) (holding that the defendant was not prejudiced by the exclusion of extrinsic evidence of a prior inconsistent statement by a witness since, inter alia, the "basic fact of an inconsistency . . . became known to the jury").

2.

Young also challenges the district court's exclusion of the tape in his own case-in-chief. After recalling Henderson, Young requested that the entire audiotape be played during Henderson's testimony. The district court denied Young's motion on two grounds. First, the court found that Young's failure to disclose the audiotape to the government constituted a violation of the court's discovery order. Alternatively, the court held that the audiotape was inadmissible under Rule 403.

The district court's discovery order required the defendant to permit the government, upon its request, to inspect or copy "tangible objects . . . which are within the possession, custody or control of the defendant and which the defendant intends to introduce as evidence in chief at the trial." J.A. 24. The discovery order was entered upon motion of the defendant under Fed. R. Crim. P. 16, and explicitly tracks the language of that Rule. As a result, any violation of the court's discovery order also constituted a violation of Rule 16. See United States v. Gomez, 191 F.3d 1214, 1218 (10th Cir. 1999).

Young argues that the district court erred in finding that his failure to disclose the tape was in contravention of the court's discovery order and Rule 16. But decisions regarding whether a party has complied with Rule 16 are left to "the sound discretion of the trial court"

10

and we review such orders only "for an abuse of discretion." <u>United States</u> v. <u>Fletcher</u>, 74 F.3d 49, 54 (4th Cir. 1996). Here, the district court did not abuse its discretion in finding that Young failed to comply with his discovery obligations.

Specifically, Young contends that he did not violate Rule 16 because he had no intention of introducing the audiotape as "evidence in chief," but rather intended to use the audiotape to impeach Henderson during the government's case-in-chief. Defense counsel did attempt to offer the tape during his cross-examination of Henderson, yet the record supports the district court's conclusion that Young <u>intended</u> to offer the tapes not for impeachment purposes, but as "evidence in chief" that Henderson committed the crime.

For instance, Young argues on appeal -- as he did below -- that the "tapes were offered, <u>not merely to impeach yet another government witness, but to prove Henderson murdered Diana Medina</u>." Appellant's Br., at 19 (emphasis added). Young's attempt to introduce the tape during cross-examination could have been interpreted by the district court as an effort to circumvent the court's unambiguous discovery order and thus escape disclosure when his true intent was to introduce the tape as "evidence in chief." Therefore, we cannot say that the district court abused its discretion when it ruled that Young's failure to disclose the audiotape violated Rule 16. Exclusion of undisclosed evidence is a permissible sanction for a violation of Rule 16.**5**

In addition, not only was the sanction of exclusion explicitly authorized by the Rule, but it was also an appropriate response to defense counsel's conduct. Young knew of the audiotape prior to trial and could have disclosed it easily. However, he did not provide notice of the tape until literally moments before the close of the government's case-in-chief. As a result, the district court could have reasonably concluded that the government -- which unlike Young, disclosed all evidence subject to the discovery order prior to trial -- was prejudiced because it was unable to coordinate its case to account for the

_____

**5** Rule 16(d)(2) provides that if "a party has failed to comply with [Rule 16], the court may . . . prohibit the party from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances."

11

audiotape. Under these circumstances, we cannot say that the district court abused its discretion in excluding the audiotape.**6** See United States v. Ford, 986 F.2d 57, 59 (4th Cir. 1993) (reviewing the sanction imposed for a violation of a discovery order for an abuse of discretion).

Moreover, even if the district court erred in excluding the audiotape during Henderson's case, any such error was harmless. At argument, defense counsel conceded that the district court allowed him to inquire into virtually all of the relevant areas on the tape by questioning Henderson directly about them. J.A. 1325-34. Henderson admitted to each statement he was asked about. Thus, though the tape was not played before the jury, there is no dispute that its contents were brought before the jury by way of Henderson's testimony.

Indeed, defense counsel candidly conceded at argument that the real harm resulted from the fact that the jury did not listen to the tape itself, which according to counsel, deprived them of the benefit of hearing Henderson's voice intonations and the rising frustration in his voice. See also Appellant's Br., at 20. The district court, however, addressed that point specifically by finding that there were no "nuances that the written word doesn't reflect." J.A. 1318. Since there is no showing that this factual finding by the district court was clearly erroneous, if any error occurred in this case, we can say "with fair assurance . . . that the judgment was not substantially swayed by the error" and was thus harmless. United States v. Ince, 21 F.3d 576, 583 (4th Cir. 1994) (quoting Kotteakos v. United States, 328 U.S. 750, 765 (1946)).

B.

Finally, Young contends that even if the tape was not admissible as an evidentiary matter, its exclusion violated his constitutional right to due process. See Green v. Georgia, 442 U.S. 95, 97 (1979); Chambers v. Mississippi, 410 U.S. 284, 302 (1973). We disagree.

_____

**6** Of course, the district court's conclusions under Fed. R. Evid. 403 also support exclusion of the tape in Young's case-in-chief for the same reasons outlined in Part II.A.1. See supra at 8-9.

In Chambers and Green, "the Supreme Court held that, to prevent a defendant from being deprived of a fair trial, the Due Process Clause required admission of exculpatory confessions by third parties -- even if otherwise excludable on the basis of state evidentiary rules -- where the evidence is `highly relevant to a critical issue' in the case, and sufficient indicia of reliability exist."[7] Huffington v. Nuth, 140 F.3d 572, 584 (4th Cir. 1998). However, unlike the evidence at issue in Chambers and Green, this case does not involve a third-party confession.

When defense counsel was asked at oral argument to cite the single most exculpatory excerpt on the tape, he recounted the following passage:

> Young: Lord have mercy. Well look, Joe. I'm telling you, I'm sitting up here. I said, even though -- I'm sitting up at Cindy's crib. I wouldn't tell the FBI nothing, and they know they -- they went after my grandmother and they know I got a good alibi and s--t. And somebody down there dropping a dime, as soon as I found out who it is --
>
> Henderson: Who the hell would even --
>
> Young: -- as soon as I find out who it is, I'm going to let you know, Joe.
>
> Henderson: All right, man.

J.A. 1033. As the district court pointed out, however, this passage is fraught with ambiguity. J.A. 1008. Henderson's statement "[w]ho in the hell would even" is as likely to be a manifestation of Henderson's anger at being falsely accused as it is to be an acknowledgment that someone else knew that he committed the crime. Even defense counsel admitted at trial that there was more than one plausible interpretation of Henderson's statement. J.A. 1008. Indeed, all the statements

_____

[7] We have previously applied Chambers and Green to cases prosecuted under the Federal Rules of Evidence. See United States v. Hinkson, 632 F.2d 382, 386 (4th Cir. 1980).

13

cited by defense counsel are ambiguous at best, and none rises to the level of a third-party confession.

Accordingly, we hold that the district court's exclusion of the audiotape did not implicate due process.

III.

Young next argues that the district court erred in admitting evidence of Young's prior convictions for the assault and reckless endangerment of Pyboon Medina, Diana's mother. Young first asserts that the convictions were inadmissible under Fed. R. Evid. 404(b) or 609(a). Alternatively, he contends that even if the convictions satisfied those Rules, Rule 403 mandated exclusion because the probative value was substantially outweighed by the danger of unfair prejudice. The government responds that the prior convictions established consciousness of guilt and were thus admissible. We agree.

Rule 404(b) prohibits evidence of other crimes or bad acts to show bad character or propensity to break the law. See United States v. Hayden, 85 F.3d 153, 159 (4th Cir. 1996). However, "bad acts" evidence is still admissible for other purposes, which include, but are not limited to, "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed. R. Evid. 404(b); United States v. Van Metre, 150 F.3d 339, 349 (4th Cir. 1998). Rule 404(b) is viewed as "an inclusive rule, admitting all evidence of other crimes or acts except that which tends to prove only criminal disposition." Van Metre, 150 F.3d at 349.

In United States v. Hayden, 85 F.3d 153 (4th Cir. 1996), we recognized that evidence of witness intimidation is admissible to prove consciousness of guilt if it is both related to the offense charged and reliable. 85 F.3d at 159. While Young correctly notes that Pyboon Medina was not yet officially a witness in any case against him, it is also without dispute that Young knew that she was cooperating with federal authorities and was a potential witness against him if a federal prosecution occurred. J.A. 1167, 1176, 1184-85.

Threats or intimidation against an actual witness are admissible because they establish a defendant's "consciousness that his case is a

14

weak or unfounded one; and from that consciousness may be inferred the fact itself of the cause's lack of truth and merit." <u>Van Metre</u>, 150 F.3d at 352 (quoting 2 Wigmore on Evidence § 278 (Chadbourn Rev. 1979)). We see no reason why our holding in <u>Hayden</u> should not be extended to the facts before us today; a defendant's decision to intimidate a potential witness or a cooperating individual is similarly probative in establishing that a defendant may believe his case is weak, thus demonstrating consciousness of guilt and warranting admission under Rule 404(b). <u>See United States</u> v. <u>DeAngelo</u>, 13 F.3d 1228, 1232 (8th Cir. 1994) ("[E]vidence of death threats against witnesses or other parties cooperating with the government is generally admissible against a criminal defendant to show consciousness of guilt of the crime charged."); <u>United States</u> v. <u>Bein</u>, 728 F.2d 107, 114-15 (2d Cir. 1984) ("Evidence of threats by a defendant against a potential witness against him can . . . be used to show guilty knowledge.").

Hence, we apply the factors set forth in <u>Hayden</u>, and accordingly hold that the evidence of intimidation in this case was both reliable and related to the offense charged. The evidence proffered by the government was reliable since Young was convicted by a jury in Maryland state court. And, of course, the convictions were related to the murder of Diana Medina. Young did not chase and assault a random bystander; he assaulted the victim's mother, who was a potential witness against him in a federal prosecution for murder.

However, even if both factors in <u>Hayden</u> are met, evidence of the convictions must still satisfy Rule 403. <u>See United States</u> v. <u>Sanders</u>, 964 F.2d 295, 299 n.4 (4th Cir. 1992). Young argues that the similarity between the crimes of violence against Diana Medina and Pyboon Medina -- including the use of a handgun in both crimes -- required exclusion under Rule 403. If Young's convictions for assault and reckless endangerment were completely unrelated to Diana's murder, then Young's arguments would be worthy of considerable attention. <u>See id</u>. at 298-99. But that is simply not the case here. The district court held that the convictions were admissible precisely because of the nexus between Young's crimes against Diana and Pyboon Medina -- namely, the relationship between the two victims and the probative value of establishing witness intimidation. J.A. 1184-86. Further, Young's defense that Henderson committed the murder rendered the prior convictions particularly probative in this case. For, it was Young

15

-- and not Henderson -- who chased Pyboon Medina and assaulted her.

Accordingly, we hold that the district court did not abuse its discretion in admitting evidence of Young's prior convictions for the reckless endangerment and assault of Pyboon Medina.

IV.

Young next claims that the evidence was insufficient to convict him of interstate kidnapping. Specifically, Young contends that the government failed to prove that he formed the requisite intent to commit the crime prior to crossing state lines. See Van Metre, 150 F.3d at 350; United States v. Hughes, 716 F.2d 234, 237, 239 (4th Cir. 1983).

The relevant question in reviewing for sufficiency of the evidence "is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). To establish a violation of 18 U.S.C. § 1201(a), the government must show, inter alia, that the victim was seized, confined, inveigled, decoyed, kidnapped, abducted or carried away prior to the crossing of state lines. See United States v. Wills, 234 F.3d 174, 177 (4th Cir. 2000).

The evidence supports the jury's determination that Young inveigled or decoyed Diana prior to leaving Maryland and entering into Virginia.[8] See Hughes, 716 F.2d at 239 (noting that a person "who accepted a ride from someone who misled her into believing that she would be taken to her desired location was `inveigled' or `decoyed' within the meaning of the federal kidnapping statute"). First, the jury could have concluded based on the evidence that Diana had no interest in traveling to Virginia with Young, thus undercutting his contention that she traveled with him there voluntarily. Instead, the record confirms that Diana's primary concern was that she not miss her shift

_____

[8] Young's cellular telephone records indicated that he and Diana drove through Prince George's County, Maryland, following their departure from Vanida's house. J.A. 656-59.

16

at Ledo Pizza, her place of employment located in Clinton, Maryland. For instance, throughout the afternoon, Diana was insistent that she not be late for work again, and she even called work twice to assure her supervisor that she would not miss her shift. J.A. 611, 617. As a result, Diana accompanied Young in exchange for his specific assurance that he would drop her off at home so that she could retrieve her work uniform. J.A. 581-82. Diana's expressed intention and state of mind could have led a rational jury to conclude that Diana would not have willingly accompanied Young to Virginia and thus that he inveigled or decoyed her prior to traversing state lines. See Hughes, 716 F.2d at 239 (stating that in many cases, intent "can be inferred only from circumstantial evidence").

Second, Young recounted a chilling tale, which purported to be Henderson's version of the graphic details of the murder. By Young's own admission, that series of events established that Diana was abducted, raped, and then transferred across state lines before she was finally shot ten times. J.A. 1219-23, 1239. While Young ascribed this harrowing recitation to Henderson, the jury was entitled to disbelieve Young and conclude that Young was relaying the details of the crime that he himself committed.

Finally, we held in Hughes that a defendant's pattern of false explanations and fabrication of evidence may be considered by a jury in determining whether a defendant inveigled or decoyed a victim under section 1201. 716 F.2d at 240-41. In this case, Young was deceitful throughout the investigation and trial. Young admitted to a whole series of lies during his testimony at trial, including, inter alia, the following: (1) he lied to Agent Miller when he told him that he dropped Diana off near Ledo Pizza, J.A. 1240; (2) he lied when he told an officer that his rental car had been stolen, J.A. 1248; and (3) he lied when he told an officer that he had left his gun in the trunk of his rental car, J.A. 1249. These false statements, among others, were "properly considered by the jury as probative evidence of his illicit intent." Hughes, 716 F.2d at 241.

In sum, we conclude that the jury's verdict on the interstate kidnapping count was sufficiently supported by the record, and that the dis-

17

trict court therefore did not err in denying Young's motion for judgment of acquittal.[9]

V.

Young's final contention on appeal is that the district court erred when it did not acquit him on counts two and four of the indictment, which charged him with violating 18 U.S.C. § 924(j) by causing Diana's death through the use of a firearm in the course of a violation of 18 U.S.C. § 924(c). Specifically, Young argues that the government failed to prove the jurisdictional element for murder in 18 U.S.C. § 1111(b), which Young claims is incorporated by section 924(j). We disagree.

Section 924(j) provides that:

> A person who, in the course of a violation of [18 U.S.C. § 924(c)], causes the death of a person through the use of a firearm, shall --
>
> (1) if the killing is a murder (<u>as defined in section 1111</u>), be punished by death or by imprisonment for any term of years or for life . . . .

18 U.S.C. § 924(j) (emphasis added). Section 1111, in turn, has two subsections. Section 1111(a) defines murder and differentiates between its different degrees. It provides that:

> <u>Murder is the unlawful killing of a human being with malice aforethought.</u> Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or

_____

[9] Young also contends that the crime of interstate stalking required the government to prove that Young possessed the intent to injure Diana prior to entering into Virginia. <u>See</u> 18 U.S.C. § 2261A. However, even if Young is correct about the intent requirement under section 2261A -- a question we need not and do not decide today -- the same evidence supporting the interstate kidnapping count would also be sufficient to sustain the jury's verdict on the interstate stalking count.

attempt to perpetrate, any arson, escape, murder, kidnapping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, burglary, or robbery; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree.

Any other murder is murder in the second degree.

18 U.S.C. § 1111(a) (emphasis added). Section 1111(b) prescribes penalties for those guilty of committing murder:

Within the special maritime and territorial jurisdiction of the United States,

Whoever is guilty of murder in the first degree shall be punished by death or by imprisonment of life;

Whoever is guilty of murder in the second degree, shall be imprisoned for any term of years or for life.

18 U.S.C. § 1111(b). Young argues that 18 U.S.C. § 924(j)(1) incorporates both subsections of section 1111, and that the government was therefore required to prove that Diana's murder occurred within "the special maritime and territorial jurisdiction of the United States."

Section 924(j)(1), however, incorporates only the definition of murder contained in section 1111. That definition is found exclusively in section 1111(a). See 18 U.S.C. § 1111(a) ("Murder is the unlawful killing of a human being without malice aforethought. . . .") (emphasis added). Section 1111(b), by contrast, is not a definitional section at all. Instead, it sets forth penalties for murder under 18 U.S.C. § 1111 and creates a jurisdictional requirement for such count -- namely, that the murder be committed "[w]ithin the special maritime and territorial jurisdiction of the United States." 18 U.S.C. § 1111(b). Because section 924(j)(1) refers only to the definition of murder in section 1111, section 924(j)(1) incorporates only section 1111(a). See United States v. Chong, 123 F. Supp. 2d 563, 566 (D. Haw. 1999); cf. Nguyen v. United States, 155 F.3d 1219, 1225 (10th Cir. 1998)

19

(explaining that a section 924(j) violation requires proof of "a felony murder under 18 U.S.C. § 1111(a)").

Moreover, section 924(j)(1) incorporates the jurisdictional requirement from section 924(c). See 18 U.S.C. § 924(c) ("[A]ny person who, during and in relation to any crime of violence or drug trafficking crime . . . for which the person may be prosecuted in a court of the United States . . . ."). Thus, we reject Young's argument that his conviction under section 924(j) required proof that he murdered Diana "within the special maritime and territorial jurisdiction of the United States" because the jurisdictional element of a section 924(j) violation in this case was already satisfied through the predicate offenses of interstate kidnapping and interstate stalking -- crimes of violence as defined for purposes of section 924(c).

CONCLUSION

For the reasons stated herein, the judgment of the district court is affirmed.

AFFIRMED

WIDENER, Circuit Judge, concurring:

I concur in the result and in the opinion of the court.

So far as reading to the jury, thus admitting into evidence, a transcript of a tape recording of a conversation, I continue my opposition to the circuit rule admitting such. See United States v. Soc'y of Indep. Gasoline Marketers of America, 624 F.2d 461, 474-75 (4th Cir. 1980).

20