**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

v.

STEPHEN M. KELLY,
        *Defendant-Appellant.*

No. 11-30084

D.C. No.
3:10-cr-05586-
BHS-1

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

v.

LYNNE T. GREENWALD,
        *Defendant-Appellant.*

No. 11-30085

D.C. No.
3:10-cr-05586-
BHS-5

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

v.

WILLIAM J. BICHSEL,
        *Defendant-Appellant.*

No. 11-30086

D.C. No.
3:10-cr-05586-
BHS-3

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

v.

SUSAN S. CRANE,
        *Defendant-Appellant.*

No. 11-30087

D.C. No.
3:10-cr-05586-
BHS-2

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

          v.

ANNE MONTGOMERY,
          *Defendant-Appellant.*

No. 11-30090

D.C. No.
3:10-cr-05586-
BHS-4

OPINION

Appeal from the United States District Court
for the Western District of Washington
Benjamin H. Settle, District Judge, Presiding

Argued and Submitted
March 8, 2012—Seattle, Washington

Filed April 13, 2012

Before: Richard A. Paez and Mary H. Murguia,
Circuit Judges, and James S. Gwin, District Judge.*

Opinion by Judge Gwin

*The Honorable James S. Gwin, United States District Judge for the
Northern District of Ohio, sitting by designation.

## COUNSEL

Roger A. Hunko, Law Offices of Wecker A. Hunko, Port Orchard, Washington; Thomas A. Campbell, Law Offices of Steven D. Weier, Auburn, Washington; Jerome Kuh, Assistant Federal Public Defender, Federal Public Defender's Officer, Tacoma, Washington; Paula Olson, Tacoma, Washington; Blake Kremer, Tacoma, Washington, for the defendants-appellants.

Arlen R. Storm, Assistant United States Attorney, United States Attorney's Office, Tacoma, Washington, for the plaintiff-appellee.

---

**OPINION**

GWIN, District Judge:

On November 2, 2009, appellants Father Stephen Kelly, Lynne Greenwald, Father William Bichsel, Susan Crane, and Sister Anne Montgomery—in an act of symbolic protest against nuclear weapons—cut their way through two fences and into a secure area of United States Naval Base Kitsap-Bangor, near Seattle. All are longtime peace and disarmament activists. Two are Catholic priests, and one is an eighty-year-old Catholic nun. Two others are grandmothers.

Once inside, the group spread "simulated blood" on base fences and unfurled a banner reading, "Plowshares — Trident Illegal and Immoral." (Although the government is tight-lipped about Kitsap-Bangor's mission, appellants say the base houses submarines carrying nuclear-warhead-tipped Trident missiles.) Shortly afterwards, Marines detained the protestors. The United States later initiated this criminal prosecution.

A jury convicted appellants of conspiracy to trespass, to destroy property within the special territorial jurisdiction of the United States, and to injure property of the United States having a value exceeding $1,000, violating 18 U.S.C. § 371. The jury also separately convicted appellants of the underlying trespass, violating 18 U.S.C. § 1382; destruction of property (*i.e.*, the fences) within the special territorial jurisdiction of the United States, violating 18 U.S.C. § 1363; and injuring property of the United States with a value exceeding $1,000, violating 18 U.S.C. § 1361.

On appeal, appellants challenge the district court's refusal to dismiss the indictment. They argue that international law preempts 18 U.S.C. §§ 1361, 1363, and 1382. They similarly argue that the district erred when it refused to instruct the jury on their international-law defense. Finally, they challenge the district court's jury-instruction definition of the statutory term "maliciously," as used in 18 U.S.C. § 1363, and the sufficiency of the government's evidence that appellants' conduct was "malicious." We affirm.

I.

Before trial, appellants moved to dismiss the indictment, arguing, among other things, that the 1907 Hague Convention Respecting the Laws and Customs of War on Land and its Annex, Oct. 18, 1907, 36 Stat. 2277 (the Hague Convention), supersedes or abrogates 18 U.S.C. §§ 1361, 1363, and 1382. The United States ratified the treaty in 1909.[1] The district court denied the motion. Later, at the government's request, the district court prohibited appellants from "put[ting] into evidence or argu[ing] the application of international law" at trial.

[1] Appellants now renew their argument that the Hague Convention, which "prohibit[s]" the "attack or bombardment" of "undefended" towns and "especially forbid[s]" the "employ[ment of] arms, projectiles, or material calculated to cause unnecessary suffering," 36 Stat. at 2301-02, conflicts with the United States laws prohibiting the destruction of government property, at least when the government uses that property to protect nuclear weapons. Accordingly, the argument goes, the Hague Convention supersedes §§ 1361, 1363, and 1382, and requires dismissal of the indictment. Appellants are incorrect.

---

[1]*See* 36 Stat. at 2277 ("Signed at The Hague October 18, 1907; ratification advised by the Senate March 10, 1908; ratified by the President of the United States February 23, 1909; ratification deposited with the Netherlands Government November 27, 1909.").

Whether a treaty supersedes a domestic criminal statute is a legal question, requiring de novo review. The Supreme Court "has long recognized the distinction between treaties that automatically have effect as domestic law, and those that —while they are international law commitments—do not by themselves function as binding federal law." *Medellin v. Texas*, 552 U.S. 491, 504 (2008). "[A] treaty is equivalent to an act of the legislature, and hence self-executing, when it operates of itself without the aid of any legislative provision." *Id.* at 505 (internal quotation marks omitted). "Only if the treaty contains stipulations which are self-executing, that is, require no legislation to make them operative, will they have the force and effect of a legislative enactment." *Id.* at 505-06 (alterations and internal quotation marks omitted).

Had we any need, we might conclude that the relevant articles of the Hague Convention are not self-executing and, therefore, have no "force [or] effect" on any other federal law. *Id.* (internal quotation marks omitted). Although those articles contain express "prohibitions," Article 1 of the Convention contemplates that the contracting parties will, after ratification, "issue instructions to their armed land forces which shall be in conformity with the Regulations respecting the Laws and Customs of War on Land, annexed to the present Convention." Hague Convention, art. 1, 36 Stat. 2290. This anticipatory language suggests the parties would take later, individual steps to carry out the Convention's directives, rather than to give the Convention itself domestic legal effect. *See Goldstar (Panama) S.A. v. United States*, 967 F.2d 965, 968-69 (4th Cir. 1992) ("[T]he Hague Convention is not self-executing, . . . instead, the signatories contemplated that individual nations would take subsequent executory actions to discharge the obligations of the treaty."); *see also Islamic Republic of Iran v. Boeing Co.*, 771 F.2d 1279, 1283 (9th Cir. 1985) ("[T]he purposes of the treaty and the objectives of its creators . . . . is the [ ] factor that is critical to determine whether an executive agreement is self executing . . . ." (emphasis and internal quotation marks omitted)); 18 U.S.C. § 2441 (punish-

ing the commission of a "war crime," including "any conduct . . . prohibited by Article 23, 25, 27, or 28 of the Annex to the Hague Convention IV, Respecting the Laws and Customs of War on Land . . . .").

**[2]** Nevertheless, we need not decide whether the Hague Convention is self-executing because even if it is, it has only equal footing with other federal laws, *see Whitney v. Robertson*, 124 U.S. 190, 193-94 (1888), and where a treaty conflicts with another federal law, the more recent of the two controls, *see Cook v. United States*, 288 U.S. 102, 118-19 (1933). Even supposing the Hague Convention is self-executing, it became law in the United States in 1909, well before the first United States Code codifications of §§ 1361, 1363, and 1382. *See* 62 Stat. 683, 764-65 ("revis[ing], codif[ying], and enact[ing] into positive law" 18 U.S.C. §§ 1361, 1363, 1382). Furthermore, Congress has periodically modified those statutes; § 1361 most recently in October 1996, 110 Stat. 3498, 3510-11; § 1363 most recently in October 2001, 115 Stat. 381; and § 1382 most recently in September 1994, 108 Stat. 2147. Accordingly, to the extent the Hague Convention conflicts with those federal criminal statutes, the later-modified statutes supersede the treaty.

**[3]** Moreover, the treaty-statute conflict appellants suggest is illusory. The relevant Hague Convention articles are found in Section II, entitled "HOSTILITIES," Chapter I, entitled "Means of injuring the enemy, sieges, and bombardments," and provide: (1) that "it is especially forbidden . . . [t]o *employ* arms, projectiles, or material calculated to cause unnecessary suffering," art. 23(e), 36 Stat. at 2301-02 (emphasis supplied); and (2) that "[t]he *attack or bombardment*, by whatever means, of towns, villages, dwellings, or buildings which are undefended is prohibited," art. 25, 36 Stat. at 2302 (emphasis supplied). The "natural reading" of these provisions, *see Medellin*, 552 U.S. at 507, is that the Hague Convention prohibits the *use* of certain weapons in "armed conflicts between nations," *i.e.*, "war," 36 Stat. at

2279. *See* 5 Oxford English Dictionary 190 (2d ed. 1998) (To "employ" means "[t]o apply (a thing) to some definite purpose; to use as a means or instrument, or as material.").

**[4]** So if nuclear weapons are weapons "calculated to cause unnecessary suffering," the Hague Convention prohibits their "employ[ment]" as a "[m]eans of injuring the enemy. . . ." 36 Stat. at 2301-02. The Hague Convention does not explicitly prohibit mere possession (and enclosure within fencing) of such weapons.

**[5]** In the end, Congress has decided to protect the property of the United States. The Hague Convention neither conflicts with nor supersedes those statutes. The district court properly refused to dismiss the indictment.[2]

## II.

Appellants' remaining arguments address their convictions for "willfully and maliciously" destroying or injuring "any structure, conveyance, or other real or personal property" within the special maritime and territorial jurisdiction of the United States. 18 U.S.C. § 1363. They argue that the district court improperly instructed the jury on the meaning of the term "maliciously" as used in 18 U.S.C. § 1363. Relatedly, appellants argue that the government offered insufficient evidence to establish that they acted maliciously when they damaged the property at the naval base.

---

[2]For this reason we also reject appellants' fourth assignment of error—that the district court improperly excluded the appellants' "international law defense and its supporting evidence" from the jury. Because the Hague Convention does not supersede the statutes criminalizing appellants' conduct, there was no "international law defense" for the jury to consider. Moreover, it would not have been appropriate to ask the jury to decide whether international law had abrogated domestic law. That was a legal question for the district judge, not the jury.

In its instructions to the jury, the district court defined "maliciously" as "wrongfully and without legal justification or excuse." In defining maliciously, the district court used the first-sense definition of "malice" found in Black's Law Dictionary. *See* Black's Law Dictionary 1042 (9th ed. 2009) (defining "malice" as "[t]he intent, without justification or excuse, to commit a wrongful act."). Appellants contend that "maliciously" means something more—in particular, that it means "had an evil intent" or "had wicked or mischievous intentions."[3] Accordingly, they say, the jury instructions were inaccurate and the evidence of their guilt insufficient. Considering the meaning of § 1363 de novo, we disagree.

When, as here, "a statute does not define a term, we generally interpret that term by employing the ordinary, contemporary, and common meaning of the words that Congress used." *United States v. Iverson*, 162 F.3d 1015, 1022 (9th Cir. 1998). For terms that "have accumulated settled meaning under . . . the common law," however, "a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms." *NLRB v. Amax Coal Co.*, 453 U.S. 322, 329 (1981); *see also Neder v. United States*, 527 U.S. 1, 21-22 (1999).

As this court has previously recognized in a similar context, the term "maliciously" had a particular meaning at common law. *See United States v. Doe*, 136 F.3d 631, 634-35 (9th Cir. 1998) (interpreting the term "willfully and maliciously" in the federal arson statute, 18 U.S.C. § 81);[4] *see also Murray v.*

---

[3]Black's Law Dictionary does list a third-sense definition of malice as "[i]ll will; wickedness of heart," though it cautions that "[t]his sense is most typical in nonlegal contexts." Black's Law Dictionary 1042 (9th ed. 2009).

[4]The legislative history of § 1363 confirms that Congress intended the term "maliciously" to bear the same meaning in both § 1363 and § 81. Provisions against the malicious burning or destruction of property entered title 18 in 1909, when Congress declared it a crime to "maliciously set fire

*Bammer (In re Bammer)*, 131 F.3d 788, 791 (9th Cir. 1997) (interpreting the term "malicious" in § 523(a)(6) of the Bankruptcy Code). Accordingly, we infer that Congress's use of the term in § 1363 was a nod to the common law.[5]

At common law, "malice" was a necessary component of the mental state for a variety of offenses—"murder, mayhem, arson, libel and malicious mischief." Rollin M. Perkins & Ronald N. Boyce, Criminal Law 856 (3d ed. 1982). And "an intent to cause the particular harm involved in the crime in question, without justification, excuse or mitigation, [was] sufficient to meet the mens-rea requirement of such offenses." *Id.* at 857. Which is to say, "in the absence of justification,

---

to, burn, or attempt to burn, or by any means destroy or injure, or attempt to destroy or injure" a variety of federal buildings. 35 Stat. 1144 (codified at 18 U.S.C. § 465 (1925)).

In 1948, Congress added §§ 81 and 1363 to title 18. *See* 62 Stat. 688, 764. A Reviser's Note in the printed U.S. Code explains that the two provisions were intended to operate in parallel: "Based on title 18, U.S.C., 1940 ed., §§ 464, 465 . . . . Sections were consolidated and rewritten both as to form and substance and that part of each section relating to destruction of property by means other than burning constitutes section 1363 of this title." 18 U.S.C. § 81 (1952).

It is clear from this legislative history that in 1948, Congress bifurcated a statute that had previously covered both arson and other forms of destruction of property into two sections, one addressed to arson and the other addressed to destruction by other means. Therefore, the Court's conclusion in *Doe* that Congress incorporated the common-law meaning of "maliciously" into § 81 compels the same conclusion with respect to § 1363.

[5]Appellants urge us to observe the conflicting dictionary definitions of "malice" and, on that basis, to apply the rule of lenity. But the rule of lenity "is reserved for cases where, after seizing everything from which aid can be derived, the Court is left with an ambiguous statute." *DePierre v. United States*, 131 S. Ct. 2225, 2237 (2011) (internal quotation marks omitted).

excuse or recognized mitigation, it is malicious to intend to do what constitutes the *actus reus* of the crime in question." *Id.*[6]

Nevertheless, the common-law definition of malice clearly recognized "the non-necessity of any element of hatred, spite, grudge, or ill-will." Perkins & Boyce, Criminal Law 857; *see also In re Bammer*, 131 F.3d at 791 (Malice "does *not* require a showing of biblical malice, i.e., personal hatred, spite, or ill-will."); 4 Charles E. Torcia, Wharton's Criminal Law § 470 (15th ed. 2011) ("[M]alice in the traditional legal sense" does not require "that the defendant harbor ill will toward the [property] owner." (footnote omitted)); 3 *id.* § 337 ("[M]alice in a literal sense is not required; a defendant may act maliciously even though he harbors no 'malevolence or ill-will' toward the owner or occupant."). It was sufficient that the defendant (1) had the intent to do the prohibited act and (2) had no justification or excuse.

**[6]** For our purposes, the particular harm produced by a violation of § 1363 is the "destr[uction] or injur[y of] any structure, conveyance, or other real or personal property" within the federal government's jurisdiction. Accordingly, a

---

[6]An "intent to do the *actus reus*, in the absence of any circumstance of exculpation or mitigation," will always be sufficient to establish malice, but may not always be necessary. Perkins & Boyce, Criminal Law at 858 ("In the absence of any circumstance of exculpation or mitigation an act may be done with such heedless disregard of a harmful result, foreseen as a likely possibility, that it differs little in the scale of moral blameworthiness from an actual intent to cause such harm. . . . [W]hile such an act is not done with an actual intent to cause the harm, it is constructively with a malicious intention." (internal quotation marks omitted)). Because, as we explain below, there is sufficient evidence that appellants acted with actual malice, there is no need to explore at this time the possibility of a conviction resting on less. *Compare Doe*, 136 F.3d at 635 ("At common law, arson is a crime of general, rather than specific intent and the requirement that the defendant act wilfully and maliciously does not mean that the defendant must have an actual subjective purpose that the act he does intentionally shall produce . . . setting a fire or burning of the structure . . . ." (internal quotation marks omitted)).

defendant violates that section when he willfully acts, intending to destroy or injure any such property, and has no legal justification or excuse for his action.

[7] Consistent with the common-law definition of malice, the government need not prove that the defendant harbored any "[i]ll will" or "wickedness of heart," Black's Law Dictionary 1042 (9th ed. 2009) (defining "malice" in the "nonlegal" sense); even defendants who genuinely believe that their intentional, unlawful actions are consistent with "the conscience of the people," as appellants put it, are guilty.[7] *See* Wayne R. LaFave, Substantive Criminal Law § 5.3 (2d ed. 2011) ("One who intentionally destroys a fence around a graveyard without the owner's consent is guilty of . . . malicious mischief . . . , though he destroys the fence with the praiseworthy motive of building a better fence." (citing *Phillips v. State*, 29 Tex. 226 (1867))).

* * *

[8] The jury instructions here accurately presented the law to the jury. According to those instructions, the jury could convict appellants for violating § 1363 only if the jury found by proof beyond a reasonable doubt that, among other things, appellants "willfully destroyed any real property" and that they "acted maliciously, that is, wrongfully and without legal justification or excuse." Taken together, *see United States v. Park*, 421 U.S. 658, 674 (1975), those instructions permitted the jury to convict only upon its finding that appellants cut the base fences with the intent to destroy them and without any legal justification. Considering the common-law definition of "maliciously," the law required nothing more.

[9] Moreover, the evidence was sufficient to establish that appellants willfully and maliciously destroyed the fences. By

---

[7]At least to the extent that, as here, the defendants' motives do not provide them legal justification or excuse.

their own account, appellants cut holes in the fences to enter the base. Relying on that fact alone, the jury could easily have found beyond a reasonable doubt that appellants cut the fences intending to destroy or injure them. *See* 18 U.S.C. § 1363. Accordingly, appellants' convictions are

AFFIRMED.