# United States Court of Appeals
## For the First Circuit

---

No. 13-1909

UNITED STATES OF AMERICA,

Appellee,

v.

NANCY GRAY,

Defendant, Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, <u>U.S. District Judge</u>]

---

Before

Howard, Lipez, and Thompson,
<u>Circuit Judges</u>.

---

<u>Inga L. Parsons</u>, for appellant.
<u>Kelly Begg Lawrence</u>, Assistant United States Attorney, with whom <u>Carmen M. Ortiz</u>, United States Attorney, was on brief, for appellee.

---

March 13, 2015

---

THOMPSON, <u>Circuit Judge</u>. Words are slippery things. Take "malice," its legal definitions alone can encompass: the intent to commit a wrongful act, reckless disregard for the law, ill will, wickedness of heart, and the intent to kill. <u>See</u> <u>Black's Law Dictionary</u> 968-69 (7th ed. 1999). But can malice's fifty shades of meaning include "improper motive?" Former flight attendant Nancy Gray, convicted of providing false information regarding a bomb threat on an airplane, seeks to convince us that she was denied a fundamentally fair trial when her jury was instructed that malice meant "evil purpose or improper motive." Because we find that the district court's definition just won't fly, we vacate Gray's conviction and remand this case for a new trial.

**I.**

**BACKGROUND**

**A. Bomb on Board**

By September of 2009, Nancy Gray had been an American Airlines flight attendant for over ten years. On September 30, she was scheduled to work Flight 1318 from Boston to Miami. That afternoon, Gray and the rest of the flight crew boarded and began their pre-flight safety checks as the cabin service crew cleaned the aircraft.

Cabin service crew member John Marino worked his way from the back of the plane to the front, cleaning first the rear lavatories, then the middle lav before finishing with the first

class lav. This task included restocking the dispensers with paper towels, tissues, and toilet paper. To restock the paper towels, Marino had to unlatch and open a small door to access the storage area behind the towel dispenser. When he opened that door in the middle lav on Flight 1318, Marino did not see anything written on the inside of the door. While Marino was finishing up in the first class cabin, he saw a female flight attendant (Gray) enter the middle lav, and come out again.

Gray then hurried over to the lead flight attendant and told him that she had found a note in the middle lav. Together they went back to the lav, where the lead flight attendant saw, written on the inside of the storage compartment door, the words "Bomb on Board! BOS-MIA." They then rushed to the cockpit to notify the captain. Pre-boarding had begun, and by the time they returned to the middle lav with the captain, it was occupied by a passenger. Once he could enter the lav, the captain saw the message and decided to stop boarding and notify the authorities.

The aircraft was evacuated and towed to a remote area of Logan Airport where, over a period of several hours, it was searched. No bomb was found.

## B. The Confession

On December 15, 2009, Gray, whose job was suspended at the time, contacted FBI Special Agent Joseph DeVuono at his office at O'Hare International Airport to request an interview to "clear

her name."   They arranged to meet at DeVuono's office on the morning of December 23.  Gray arrived at around 9:30 a.m., carrying "a very large sized soft drink."   DeVuono offered her a cup of coffee, which she declined, but at her request, he bought her a chocolate bar.  Gray met with DeVuono and Special Agent David Mertz for an hour and a half before taking a break.  At the break, Gray -- who had been sipping the soda and eating the candy bar during the interview -- sought and received permission to test her blood sugar level.[1]  Gray showed the agents that her blood sugar was 106, and indicated that it was a good number and that she felt fine.

Gray next met with Special Agent Jay Cherry, who interviewed her for approximately two hours.[2]  DeVuono then rejoined Gray and conducted a final hour and a half interview, during which she wrote and signed the following confession:

> After careful consideration and with deep regret and remorse I take blame for writing on the door on Sept 30, 2009 Boston to Miami. The codes BOS-MIA were already on the door.  I did not have anything to do with any other threats made, ever to American Airlines. After I did it I realized what I had done.  I have been under extreme, stressful personal things in my life.  After the ground worker called me a "fucking bitch" I snapped for a moment.  I care deeply about AA, crew & the

_____

[1]There is some dispute over the question of whether Gray had been diagnosed with diabetes.  Defense counsel agreed that she would not use the word "diabetes" at trial, although the issue of "blood sugar levels" did come before the jury.

[2]Although not mentioned at trial, during this interview Gray took a lie detector test, which was administered by Cherry.

-4-

passengers.  I have loved my job & still do.
I will never do it again.  To clarify what I
wrote "Bomb on board!" It was wrong.  I'm
truly sorry.  I never want a 9-11 to happen
again and I did it more to get the ground
workers in trouble than cause what I did.

She left the FBI office at 3:45 p.m., and according to DeVuono, she did not appear impaired or disoriented.  According to her then-husband, Scot Brewer, when Gray returned home around 5:30 p.m., "she was walking funny, talking in slurred speech" and asking to see her mother, who had died ten years earlier.  Brewer gave her sweet tea and a PopTart and "she slowly started to come back around."

### C. The Trial

On August 5, 2010, a grand jury indicted Gray for giving false information regarding a bomb threat on an airplane in violation of 49 U.S.C. § 46507(1).[3]  Gray pled not guilty.[4]

During the four-day trial that ensued, the government introduced Gray's signed confession into evidence, and elicited testimony from the FBI Special Agents, American Airlines employees,

---

[3]49 U.S.C. § 46507 provides for a term of imprisonment of not more than five years if an individual "knowing the information to be false, willfully and maliciously or with reckless disregard for the safety of human life, gives, or causes to be given, under circumstances in which the information reasonably may be believed, false information about" a bomb threat on an airplane.

[4]Gray filed a motion to suppress her confession, and attached an affidavit which alleged that she had been coerced into signing a false confession.  The government opposed the motion, and on the first day of her jury trial, Gray withdrew it.

and several crew members of Flight 1318 about the bomb hoax incident and subsequent investigation. Flight Attendant Stacy Hyde testified to a possible motive, saying that Gray was "very upset with" American Airlines's handling of a medical issue she'd had. On direct examination, Hyde recalled that, previous to the day of the flight, Gray had told her "that she was going to, 'Get back at them.'" During cross-examination, Hyde was shown the statement she made to a state police officer immediately following the bomb hoax. At that time, she did not report that Gray said she'd "get back at" American Airlines. Rather, she quoted Gray as saying "They'll never be able to fire me, I'll have to quit."

Gray's ex-husband, Dr. Brewer, testified that Gray seemed incoherent and disoriented when he spoke to her after she left her FBI interview.[5] Gray did not take the stand.

## D. The Jury Instructions

Both Gray and the government submitted proposed jury instructions. Because the statute she was accused of violating requires the government to prove that Gray wrote the threat "knowing the information to be false, willfully and maliciously or

---

[5]Gray sought to offer her ex-husband's testimony that he tested her blood sugar level when she returned home from the FBI interview and saw that the monitor showed a reading of 52, a level he felt was dangerously low. Gray argues that the district court erred in ruling that Dr. Brewer (a dentist) was not an expert and could not testify about testing Gray's blood sugar, and the significance of the level he read. However, because we are vacating her conviction on other grounds, we need not address that argument.

with reckless disregard for the safety of human life," both parties offered instructions defining "maliciously." 49 U.S.C. § 46507(1). Citing Sand's Modern Federal Jury Instructions - Criminal ¶13.04, Instruction 13-24, Gray suggested the definition: "[t]o act maliciously means to do something with an evil purpose or motive." Citing United States v. Gullett, 75 F.3d 941, 947 (4th Cir. 1996), the government offered "[t]o act maliciously means to 'act[] intentionally or with willful disregard of the likelihood that damage or injury would result.'"

The district court conducted a charging conference, during which the government pointed out that this circuit has never defined malice in the context of § 46507. The government argued that absent any legislative history, the common-law definition the government had offered was the better standard. Nevertheless, the court determined that it would "sharpen" the instruction by including the definition of malice offered by the defense. The court then instructed the jury, saying:

> And then we turn to the question of what we call "malice," "willful or malicious conduct." To act maliciously in this context means to do something with an evil purpose or motive. It means to do something that is knowingly wrong, and here suggestions have been made that Ms. Gray had some malice toward American Airlines. But the [g]overnment has to prove that and you have to evaluate it. (emphasis added).

At the conclusion of jury instruction, the court held a sidebar conference and the government objected to the definition of

malice, arguing that the jury didn't need to find motive at all, that evil intent was sufficient. The court noted that "evil purpose or motive" was phrased in the disjunctive, and added "I understand the objection. I think I am going to leave it where it is." However, after sidebar, the court again addressed malice, telling the jury "what 'malice' means is to act with an <u>evil purpose or an improper motive</u>, that is 'or,' and it is up to you to decide whether or not the circumstances under these conditions, if you find them, constitute either acting with an evil purpose or acting with an improper motive." (emphasis added). Defense counsel asked for a sidebar and pointed out that "I think under [Sand's Modern Federal Jury Instruction] it's 'evil purpose or evil motive.' 'Improper purpose [sic]' I think lessens the burden." The court replied "No, it doesn't," and the jury was sent to deliberate.

An hour and twenty minutes later, the jury sent a note back with a question: "What are the 4 criteria . . . to consider for a verdict (e.g. malice)?" The court noted to the attorneys that defense counsel was concerned about the use of the word "improper" and asked counsel "what, assuming that I am going to respond more specifically about 'malice,' do you want?" Defense counsel continued to argue for "evil purpose or motive." The court offered its own definition and, after some discussion, defense

counsel asked for a brief break to review the relevant cases.[6]  The court agreed, and suggested that, so the jury could keep working, it would send back just the four elements under the statute, and would wait to "see if they ask more about 'maliciously.'"  Both parties agreed.  Twenty-five minutes later, the jury returned, not with a question, but with a verdict -- guilty.  Gray was sentenced to twenty-seven months in prison, with three years of supervised release.  This timely appeal followed.

## II.

## DISCUSSION

Gray makes several arguments on appeal, but one we find dispositive.[7]  She argues that the district court erred by instructing the jury that "malice could be an improper purpose, thus reducing the government's burden of proof."  The government counters that Gray's argument "should be deemed waived," and that in any event, the court's instruction was correct.

---

[6]The court offered: "malice in its legal sense characterizes all acts done with an evil disposition, a wrong and unlawful motive and purpose, the willful doing of an injurious act without lawful excuse."  This definition was based on that of Chief Justice Shaw in Commonwealth v. York, 9 Met. 93, 105 (Mass. 1845).  The government was "content" with that definition, but suggested that no additional definition of malice needed to be supplied.

[7]In addition to challenging the court's decision to bar expert testimony by Brewer, Gray argues that the prosecutor permitted false testimony when two eye witnesses contradicted their earlier statements.  She further asserts that the district court erred by advising the jury that she had a right against self-incrimination, and by imposing a two-point sentencing enhancement for obstruction of justice. As previously stated, we do not reach these arguments.

## A. Waiver

The government asserts that Gray offers us only a "skeletal, perfunctory argument" about the definition of malice. We have often stated that "we deem waived claims not made or claims adverted to in a cursory fashion, unaccompanied by developed argument." Rodriquez v. Municipality of San Juan, 659 F.3d 168, 175 (1st Cir. 2011). We require parties to "spell out their issues clearly, highlighting the relevant facts and analyzing on-point authority." Id. Specifically, parties "must give us the 'raw materials' . . . so that we can do our work." Id.

Here, Gray offered a short but on-point argument in her opening brief, citing to the Fourth Circuit's decision in United States v. Hassouneh, 199 F.3d 175, 182 (4th Cir. 2000), for the proposition that "evil purpose or motive . . . more accurately reflects the proper legal standard necessary to convict a person of acting 'maliciously'" under the analogous Bomb Hoax Act, 18 U.S.C. § 35. She outlined for us the sequence of events during jury instruction, and provided a transcript of the proceeding. She further developed her argument in her reply brief, and during oral argument, she focused entirely on this single issue. Therefore, we find the argument has been sufficiently developed and is not waived.

## B. Jury Instruction

We proceed, then, to the question of whether the court's second attempt at defining malice -- "to act with an evil purpose or improper motive" -- was error. "Preserved claims of instructional error are assessed on appeal under a bifurcated framework." United States v. Sasso, 695 F.3d 25, 29 (1st Cir. 2012). "[W]e consider de novo whether an instruction embodied an error of law, but we review for abuse of discretion whether the instructions adequately explained the law or whether they tended to confuse or mislead the jury on the controlling issues." United States v. Symonevich, 688 F.3d 12, 24 (1st Cir. 2012) (internal quotations omitted). Gray's claim of instructional error involves the district court's amended definition of the malice element in 18 U.S.C. § 46507(1), engendering de novo review. See Sasso, 695 F.3d at 29.

The government asserts that, where a statute does not define a common-law term like malice, courts presume that Congress adopted the common-law definition of that term. See Morissette v. United States, 342 U.S. 246, 263 (1952). The government had offered such a common-law definition in its proposed jury instruction: to "act intentionally or with willful disregard of the likelihood that damage or injury would result;" and now argues that the amended instruction given by the district court is the substantive equivalent of that definition. Gray, on the other

-11-

hand, proposed the definition found in Sand's Modern Federal Jury Instructions for violations of both § 46507(1) and the analogous Bomb Hoax Act, 18 U.S.C. § 35(b) which states, "To act 'maliciously' means to do something with an evil purpose or motive." Sand's Modern Federal Jury Instructions-Criminal ¶13.04, Instruction 13-24. In order to determine which definition of malice to adopt to best reflect Congressional intent, we must analyze the reasoning behind the conflicting definitions.

"[W]here a federal criminal statute uses a common-law term of established meaning without otherwise defining it, the general practice is to give that term its common-law meaning." United States v. Bayes, 210 F.3d 64, 68 (1st Cir. 2000) (quoting United States v. Turley, 352 U.S. 407, 411 (1957)). This is the approach taken by the Eighth Circuit in United States v. Sweet, 985 F.2d 443, 445 (8th Cir. 1993). In a brief opinion involving the analogous § 35(b) charge,[8] the Eighth Circuit upheld a district court's instruction defining "maliciously" as acting "intentionally or with willful disregard of the likelihood that damage or injury will result." Id. In doing so, it declined with little explanation the defendant's proposal that the definition should include the words "evil purpose or motive." Id.

---

[8]We will explore the similarities between these two statutes shortly.

-12-

However, we will not presume a common-law meaning if there are "grounds for inferring any affirmative instruction from Congress" to define it otherwise. Morissette, 342 U.S. at 273. This is the tack followed by the Fourth Circuit in a case also involving the related statute, the Bomb Hoax Act. The Fourth Circuit found that an instruction including the "evil purpose or motive" component "more accurately reflects the proper legal standard necessary to convict a person of acting 'maliciously' under § 35(b)." Hassouneh, 199 F.3d at 182. In reaching this conclusion, the court examined the legislative history of the Bomb Hoax Act to divine Congress's intent. Id. at 179-80. Because the statute at issue here is very similar to § 35, it is worth reviewing that history.

Prior to its amendment in 1961, 18 U.S.C. § 35 was a misdemeanor statute that punished those who willfully and knowingly imparted false information concerning a bomb threat. Id. at 179. In 1961, the Act was amended to delete the word "willfully" and incorporate the remaining language into the new subsection (a). Id. at 180. At the same time, subsection (b) was added to make it a felony to convey false information about a bomb threat "willfully and maliciously or with reckless disregard for the safety of human life." Id. at 180 (quoting 18 U.S.C. § 35(b)).

The Hassouneh court noted that the amended statute indicated "a congressional intent to subject anyone who provides

-13-

false information of the type proscribed in the statute to punishment, but to punish those who make such statements 'willfully and maliciously, or with reckless disregard for the safety of human life' more severely." Id. at 180. As further evidence of this intent, the court cited an Executive Communication from the United States Attorney General to the Speaker of the House of Representatives, made at the time the statute was amended to provide for the separate penalties, which explained that the earlier statute had created "judicial confusion over the applicability of the statute in prankster cases." Id. (quoting United States v. White, 475 F.2d 1228, 1233 n. 6 (4th Cir. 1973) (quoting 1961 U.S. Code Cong. & Admin. News, p. 3053)). In proposing the amendment that created separate penalties, the Attorney General stated,

> I submit to the Congress a bill which would make it a felony for one to convey a false report willfully and maliciously, or with reckless disregard for the safety of human life, and a misdemeanor to do so with knowledge of its false character even though without malice or reckless disregard for human life. Such a statute would clearly show the congressional intention to make it a criminal offense to give false reports even without an evil or reckless motive and would provide a more adequate penalty for those whose actions warrant it.

Id. (emphasis added). In his explanation of the need for the amendment, the Attorney General thus equated the felony standard "willfully and maliciously, or with reckless disregard" with "evil

-14-

or reckless motive." Accordingly, in deciding that the defendant's proffered "evil purpose or motive" instruction more accurately reflected the proper legal standard, the Fourth Circuit found that there were "considerable grounds for inferring that Congress intended a meaning of 'maliciously' different from the common law definition." Id. at 182.

Section 46507 and § 35 are very similar, as noted by Sand when he chose to select the Fourth Circuit's definition of malice as more appropriate to violations of § 46507(1). Both statutes provide two separate penalties for those who convey false information about bomb threats in aviation. Just as § 35(a) describes a civil penalty and § 35(b) a felony, 49 U.S.C. § 46302(a) is a civil penalty for knowingly providing false information about a bomb threat, while § 46507(1) is a felony for providing the false information about the threat "willfully and maliciously."

Like Sand, we find the Fourth Circuit approach more persuasive. To repeat, "when Congress uses a common law term and does not otherwise define it, it is presumed that Congress intended to adopt the common law definition." United States v. Patterson, 882 F.2d 595, 603 (1st Cir. 1989). However that presumption is overcome here when we consider the statutory scheme as a whole. The only difference between § 46302(a) and § 46507(1) is the addition of the words "willfully and maliciously." If

-15-

"maliciously" means "intentionally," as the common law definition states, then two redundancies would be created. First, as Hassouneh explains, there would be no difference between the two provisions, despite their very different penalties. See 199 F.3d at 182. Second, a redundancy would result between "willfully" and "maliciously" internal to § 46507(1).

"It is . . . a cardinal principle of statutory construction that we must give effect, if possible, to every clause and word of a statute." Williams v. Taylor, 529 U.S. 362, 404 (2000) (internal quotation marks omitted). The dissent favors a common law definition of malice that "specifically requires committing the wrongful act without justification, excuse, or mitigation." United States v. Serawop, 410 F.3d 656, 664 (10th Cir. 2005) (citing 50 Am. Jur. Homicide 2d § 37 (1999)). Were we to adopt this definition, we would not be adequately giving effect to the distinct mens rea of "willfully." As the district court explained, willfully means "that a person acted deliberately and intentionally; it was not done inadvertently or mistakenly. It was done on purpose as opposed to accidentally or carelessly or unintentionally." The only distinction between this and the dissent's definition of malice are the words "without justification, excuse, or mitigation." We do not believe that is

sufficient to reflect Congress's intent.[9]  See Hassouneh, 199 F.3d at 181 (noting that "maliciously" was added to 18 U.S.C. § 35(b) because "willfully" by itself "does not necessarily embrace any evil purpose but comprehends merely a voluntary and conscious imparting or conveying of the false information with which the statute deals") (internal quotation marks omitted).

We believe Sand's definition, on the other hand, is more in line with Congressional intent.  The history of § 46507(1) reveals that its statutory precursor, 49 U.S.C. § 1472(m), was modeled after § 35.  United States v. Irving, 509 F.2d 1325, 1328-29 (5th Cir. 1975).  The wiser course then, given how closely related the two statutes are, is to follow Sand's approach and define malice in the context of both § 35(b) and § 46507(1) as "evil purpose or motive."

_____

[9]Footnote 1 of the dissent implies that "a defendant who makes a knowingly false bomb threat in an effort to obtain help from law enforcement while being held hostage" could be found guilty of the civil penalty version of the crime -- and not the felony version -- because he made the threat "willfully" but not "maliciously." However, Congress never intended to apply the civil penalty to individuals who are justified in making false bomb threats. Rather, the civil penalty was created to prosecute "pranksters." Cf. Hassouneh, 199 F.3d at 181 (stating that "the statute seems to contemplate that many pranksters whose poorly developed senses of humor lead them to make statements prohibited by § 35 will be subject to the civil penalty."). Moreover, such an individual would likely be able to raise a strong justification affirmative defense.  See, e.g., Dixon v. United States, 548 U.S. 1, 8, 13-14 & n.7 (2006); United States v. Leahy, 473 F.3d 401, 405-09 (1st Cir. 2007).

-17-

We recognize that there are multiple common law definitions of malice.[10] The dissent favors a common law definition that is frequently used to distinguish manslaughter from murder. See Serawop, 410 F.3d at 664. The Seventh Circuit, on the other hand, recently upheld another common law definition of "maliciously" as "[acting] intentionally or with deliberate disregard of the likelihood that damage or injury will result." United States v. Grady, 746 F.3d 846, 848 (7th Cir. 2014) (addressing the definition of maliciously within the context of the federal arson statute). The Grady court stated that this definition is "indeed a common definition of the word," is found in the Fourth, Eighth and Eleventh Circuit model jury instructions, and "is how the common law traditionally defined the term." Id. at 849. Furthermore, the Grady court explicitly rejected the dissent's position that "malice" must include the phrase "without just cause or reason." Id. It is clear there is no "one size fits all" common law definition of malice. That said, we find "evil purpose or motive" to be a closer fit within the context of § 46507(1).

There are a couple of other reasons to favor Gray's proposed definition. "[S]tatutes which relate to the same subject

---

[10]The dissent suggests that our decision in Hernandez-Cuevas v. Taylor, 723 F.3d 91 (1st Cir. 2013), supports its "settled" common law definition of malice. To the contrary, Hernandez-Cuevas recognized that "[c]ommon law malice standards vary by jurisdiction and context." 723 F.3d at 102 n.11.

-18-

matter should be considered together so that they will harmonize with each other and be consistent with their general objective scope." Rathbun v. Autozone, Inc., 361 F.3d 62, 68 (1st Cir. 2004) (internal quotation marks omitted). We should construe 18 U.S.C. § 35(b) and 49 U.S.C. § 46507(1) in pari materia because they proscribe the same conduct and are very similarly worded. See United States v. Cothran, 286 F.3d 173, 178 (3d Cir. 2002) (stating that "§ 35(b)'s language closely tracks that of 49 U.S.C. § 46507").

Finally, to the extent the definition of malice under § 46507(1) may be ambiguous, "the rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them." United States v. Santos, 553 U.S. 507, 514 (2008) (applying the rule of lenity to adopt the defendant's proposed definition of "proceeds" in a statute as "profits"). Because Sand's definition raises the bar for the government, it favors the defendant. We hold that Gray's proposed instruction, from Sand, defining malice in the context of § 46507(1) as "to do something with an evil purpose or motive," is the appropriate definition.

Having determined that Gray's proffered definition was legally correct, we do not stop there. Had the district court allowed its original definition to stand, we wouldn't be here. But alas, the court amended its definition to include "or improper

motive."  Because "the district court has considerable discretion in how it . . . words its jury instructions," <u>United States</u> v. <u>Gonzalez</u>, 570 F.3d 16, 21 (1st Cir. 2009), we must now determine whether the instruction given conveyed the correct definition of malice, or if, as Gray contends, it diluted the meaning of the word.[11]

The government argues the three words are close enough to Gray's requested definition because they "conveyed the same meaning."  Because jury instructions demand somewhat greater precision than that required by horseshoes and hand grenades, we'll assess this argument to see if the court's definition of malice was correct or merely close, but no cigar.

The government claims that "[t]he word 'improper' imparted a sense of deliberate wrongfulness above and beyond a reckless disregard for the law, which is precisely the idea conveyed by Gray's requested 'evil purpose or motive' instruction." We must disagree.  The word improper carries several meanings, not one of which is the equal of evil.[12]  The universe of things that

_____

[11]Although this is the first time the definition of malice has been addressed within the context of § 46507, our sister circuits have addressed incorrect definitions of malice in the context of homicide, and have granted relief where the definition offered by the court impermissibly lowered the standard or shifted the burden of proof to the defendant.  <u>See</u> <u>Caldwell</u> v. <u>Bell</u>, 288 F.3d 838, 844 (6th Cir. 2002); <u>United States</u> v. <u>Wharton</u>, 433 F.2d 451, 456 (D.C. Cir. 1970).

[12]Improper has been defined as "[i]ncorrect; unsuitable or irregular," <u>Black's Law Dictionary</u> 761 (7th ed. 1999); "not in

-20-

are considered improper would encompass anything from wearing a hat indoors to filing a frivolous lawsuit. Evil, on the other hand, is more commonly used to describe something that is morally reprehensible. It should go without saying that the words are not interchangeable.

We faced a similar situation in United States v. Tobin, 480 F.3d 53, 55-56 (1st Cir. 2007). In Tobin, we addressed a jury instruction that defined "harassment" in the context of telephone calls as using the phone "in a way that is not meant as a good faith effort to communicate . . . and is done with an unjustifiable motive." Id. at 55. We held that "[t]he district court's 'bad faith-improper motive' instruction" would include the charged conduct (harassing phone calls), but "would also include almost anything else of which the jury might disapprove." Id. at 57. The same danger exists here. The court's definition allowed the jury to convict Gray if it found that she was improperly motivated by something it frowned upon. This diluted the willful and malicious element, and lowered the government's burden considerably. Notably, it resulted in a standard lower than the "willful disregard" instruction proposed by the government.

_____

accordance with truth, fact, reason, or rule; abnormal, irregular; incorrect, inaccurate, erroneous, wrong," Oxford English Dictionary, available at http://www.oed.com/view/Entry/92817; and "not in accord with propriety, modesty, good manners, or good taste," Merriam-Webster Online Dictionary, http://www.merriam-webster.com/dictionary/improper.

The district court's instruction was not nearly close enough. Instead, its definition diluted the meaning of malice to an impermissibly low standard.[13]

## C. Harmless Error

Our analysis does not end with the determination that the instruction was erroneous. "Even an incorrect instruction to which an objection has been preserved will not require us to set aside a verdict if the error is harmless." Sasso, 695 F.3d at 29. We employ "two barometers for measuring harmless error in a criminal case." Id. Issues of a constitutional dimension require the government to "prove beyond a reasonable doubt that the error did not influence the verdict." Id. (quoting Chapman v. California, 386 U.S. 18, 23-24 (1967)). If, however, the error is found to be of a non-constitutional dimension, a less stringent standard applies to allow a conviction to stand "as long as it can be said 'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.'" Id. (quoting Kotteakos v. United States, 328 U.S. 750, 765 (1946)).

---

[13]Section 46507 prohibits giving false information about a bomb threat "willfully and maliciously or with reckless disregard for the safety of human life" (emphasis added). This disjunctive phrasing provides two bases for conviction -- the jury could have found that Gray had not acted willfully and maliciously, but had acted recklessly. However, where "one of the possible bases of conviction was legally erroneous" and "it is impossible to tell which ground the jury selected," we must set aside the verdict. United States v. Nieves-Burgos, 62 F.3d 431, 436 (1st Cir. 1995).

-22-

Although Gray characterizes the incorrect jury instruction as depriving her of a fundamentally fair trial, she offers us no more than that. She does not present a constitutional argument, does not even hint at a standard of review for harmless error, does not address the question of prejudice, and seems to ask us to simply presume prejudice from the erroneous instruction. Similarly, the government provides us with no harmless error analysis.

As for what standard of review to apply, Sasso provides guidance. 695 F.3d at 30. The court in Sasso had erred by offering the jury a definition of "willfully" that diluted the level of scienter required by the statute under which the defendant had been charged. Id. In that case, we determined that the error was of the non-constitutional variety, requiring us to apply the less stringent standard to determine whether the judgment was "substantially swayed by the error." Id. at 29 (quoting Kotteakos, 328 U.S. at 765). We will do the same here.

In reviewing the record, arguably the only evidence of malice was the statement in the confession: "I did it more to get the ground workers in trouble than cause what I did," and the testimony of Flight Attendant Hyde that Gray told her that she was upset with American Airlines and would "Get back at them." The jury could have considered the full text of the confession, which included Gray's statement that she "care[d] deeply about AA, crew

-23-

& the passengers," and concluded that she may have intended some benign mischief toward a co-worker, rather than intending behavior evidencing evil intent. As to Hyde's testimony, the jury could have weighed her damning statement on the stand, and contrasted it with the more innocuous account she gave immediately following the incident to conclude that Gray bore no evil intent. Yet the jury could reasonably have deemed these intentions as improper. We therefore cannot say with fair assurance that the judgment was not substantially swayed by the error.

The government had the burden of proving that Gray wrote the bomb threat willfully and maliciously. The proof of motive was less than compelling, and Gray's motivation was debatable. The court's incorrect definition of malice -- "evil purpose or improper motive" -- impermissibly diluted the standard and introduced "too great a likelihood that the instructional error may have influenced the verdict." <u>Sasso</u>, 695 F.3d at 31. Our review of the record convinces us that the error was not harmless.

**CONCLUSION**

The district court's jury instruction was erroneous, and Gray was prejudiced by the likelihood that the diluted standard may have influenced the verdict. Consequently, we vacate the conviction and remand for a new trial in accordance with this opinion.

**-Dissenting Opinion Follows-**

**HOWARD, Circuit Judge, dissenting**.  When a federal statute incorporates a term that has accumulated a settled common law meaning, we "must infer, unless the statute otherwise dictates, that Congress means to incorporate" that term's "established meaning."  Neder v. United States, 527 U.S. 1, 21 (1999) (citation omitted).  That command is complicated in this case because, like words, "[m]alice is a rather slippery concept."  Carson v. United States, 556 A.2d 1076, 1079 (D.C. 1989).  Courts have not always been consistent in describing malice's common law definition.  But the discord that may have been bred by a few decisions ought not distract us from adhering to an established maxim of statutory interpretation.  In this case, the district court's instructions comported with the settled common law definition of malice.  I respectfully dissent because I think that the majority endorses a truncated definition of malice that leads it to unnecessarily look beyond the common law meaning and find error.

The majority accepts a definition of malice provided by the Fourth and Eighth Circuits as the settled common law meaning.  Under that definition, the majority contends, to act maliciously means, simply, to act "intentionally."  Maj. Op. at 15-16.  Yet, as substantial authority demonstrates, that definition is, at best, incomplete.  "Malice is not satisfied simply by [acting] with an intentional or reckless mental state."  United States v. Serawop, 410 F.3d 656, 664 (10th Cir. 2005).  Instead, the settled common

-25-

law definition of malice "specifically requires committing the wrongful act without justification, excuse, or mitigation."  Id. (emphasis added); accord Black's Law Dictionary 1100 (10th ed. 2014) (defining malice as the "intent, without justification or excuse, to commit a wrongful act").  We have previously acknowledged this precise definition, including its requirement of more than a mere intentional action.  See Hernandez-Cuevas v. Taylor, 723 F.3d 91, 102 n.11 (1st Cir. 2013).

Other circuits have also endorsed this unabridged common law definition when construing Congress's use of the term malice in federal statutes.  In Serawop, for example, the Tenth Circuit adopted this meaning for purposes of the federal manslaughter statute, 18 U.S.C. § 1112.  See 410 F.3d at 664.  The Ninth Circuit, too, has applied this common law definition to certain federal statutes.  See United States v. Kelly, 676 F.3d 912, 918 (9th Cir. 2012) (construing statute criminalizing willful and malicious destruction of maritime property, codified at 18 U.S.C. § 1363); United States v. Doe, 136 F.3d 631, 634-35 (9th Cir. 1998) (construing arson statute, codified at 18 U.S.C. § 81).

This definition's common law pedigree is further confirmed by its repeated invocation in the decisions of several state courts and the District of Columbia, as well as in various treatises.  See, e.g., McGee v. State, 162 P.3d 1251, 1258 & n.32 (Alaska 2007) (defining malice as the "the intentional commission

-26-

of 'an unlawful act without justification or other legal excuse'"); <u>Carson</u>, 556 A.2d at 1079 (adopting definition that includes "the absence of all elements of justification, excuse or recognized mitigation" when construing a cruelty to children statute); <u>Dean</u> v. <u>State</u>, 668 P.2d 639, 643 (Wyo. 1983) (defining malice as "that state of mind which actuates conduct injurious to others without lawful reason, cause or excuse"); <u>Commonwealth</u> v. <u>York</u>, 50 Mass. (9 Met.) 93, 105 (1845) (defining malice "in its legal sense" as meaning "a wrongful act, done intentionally, without just cause or excuse"); Am. Jur. 2d <u>Criminal Law</u> § 129 (2008) ("Malice, in its legal sense, denotes that condition of mind manifested by intentionally doing a wrongful act without just cause or excuse."); Rollin M. Perkins & Ronald N. Boyce, <u>Criminal Law</u> 857 (3d ed. 1982) ("[I]n the absence of justification, excuse or recognized mitigation, it is malicious to intend to do what constitutes the *actus reus* of the crime in question.").

As pertinent here, the federal statute that Gray was charged with violating proscribes making a false bomb threat "willfully <u>and</u> maliciously" while "knowing the information to be false."  49 U.S.C. § 46507(1) (emphasis added).  By including "maliciously," Congress indicated that the government must prove, beyond a reasonable doubt, that a defendant acted without a cognizable justification, excuse, or mitigating motivation. <u>Serawop</u>, 410 F.3d at 664 & n.5.  Indeed, the Supreme Court has

distinguished *mens rea* elements like "knowingly" and "willfully" -- where the government need not disprove the existence of excuses or justifications -- from "malice" where "the nature of the *mens rea* would require the Government to disprove the existence" of those justifications "beyond a reasonable doubt." Dixon v. United States, 548 U.S. 1, 6 & n.4 (2006). We, too, have recognized that where malice is included as an element of an offense, the government must prove the absence of any justification "beyond a reasonable doubt."[14] Gagne v. Meachum, 602 F.2d 471, 472-73 (1st Cir. 1979).

Properly viewed, then, the common law definition of malice is not the truncated one supplied by the cases the majority relies on.[15] To be sure, to act maliciously a defendant must act

---

[14] And the majority's concern that adopting the actual common law definition does not adequately give effect to the distinct *mens rea* of "willfully," see Maj. Op. at 16-17, is misplaced. To act "willfully" means to act intentionally; in other words, one acts "willfully" when she acts deliberately rather than inadvertently or mistakenly. But one acts "maliciously" -- without justification or excuse -- when she acts without a valid reason, even if she acts intentionally and not out of mistake or inadvertence. For example, under the settled common law definition one might argue that a defendant who makes a knowingly false bomb threat in an effort to obtain help from law enforcement while being held hostage acts "willfully" (i.e., on purpose) but not "maliciously" (because she does so justifiably).

[15] As I have explained, I find the reasoning of those circuits that have embraced this truncated definition unpersuasive. The majority cites to a recent Seventh Circuit case, United States v. Grady, 746 F.3d 846 (7th Cir. 2014), as proof that there is no "one size fits all" common law definition of malice. See Maj. Op. at 18. Yet, Grady relies on cases that have endorsed the very decisions I find unpersuasive. See, e.g., United States v.

-28-

"intentionally or with willful disregard." Maj. Op. at 11. But an instruction requiring the government to prove that the defendant acted merely intentionally, without more, is incomplete. See Wade v. State, 368 S.E.2d 482, 488 (Ga. 1988) (finding error where malice instruction excluded element that the defendant acted "without justification or serious provocation" because the instruction "by its incompleteness, removed from the prosecution the burden of proving every element of the crime . . . beyond a reasonable doubt" (citation omitted)).

Thus, the Fourth Circuit's discovery of a redundancy in an analogous statute, the Bomb Hoax Act, rests on a flawed premise. See United States v. Hassouneh, 199 F.3d 175, 182 (4th Cir. 2000) ("[I]f 'maliciously' simply meant 'intentionally,' there would seem to be a redundancy."). The majority's reliance on Hassouneh to drive its analysis of the statute in this case similarly leads it astray. Having found malice at common law to require only an

_____

Gullett, 75 F.3d 941, 947 (4th Cir. 1996) (citing United States v. Sweet, 985 F.3d 443, 445 (8th Cir. 1993)). And, in any event, I do not read Grady to provide the categorical rejection of the phrase "without just cause or reason" the majority opinion portends. Instead, the Seventh Circuit equivocated on the common law definition in some respect. The court noted that, in the specific case before it, "the district court's decision to omit the 'without just cause or reason' language from the instruction" was nevertheless "well-supported by the record" because "Grady ha[d] failed to point to any cognizable legal justification for starting the fire." Grady, 746 F.3d at 849. The court concluded, thus, that "[t]here was simply no legal basis to include the phrase and the district court acted well within its discretion in omitting it." Id.

intentional action, the majority then resolves that it must define malice as "evil purpose or motive" for purposes of 49 U.S.C. § 46507(1) in order to avoid creating indistinguishable civil and criminal prohibitions.[16]  Yet, because common law malice requires the government to make an additional showing that the defendant acted "without justification, excuse, or mitigation," employing the common law definition in § 46507(1) will create no redundancy that requires us to look beyond the common law.

To support its conclusion, the majority also invokes a single stray remark by the Attorney General at the time that an analogous statute, the Bomb Hoax Act, was amended.  Yet, the

---

[16] The majority describes an additional "redundancy" not identified in Hassouneh, claiming that if "maliciously" meant intentionally, there would be a redundancy within § 46507(1).  As an initial matter, this observation further supports my contrary conclusion that malice, under the common law, does not mean "intentionally."  Because federal and state statutes frequently pair the terms "willful" and "malicious," it is hard to believe that courts and legislatures have long made use of redundant words when defining criminal and civil prohibitions.  See, e.g., 10 U.S.C. § 926; 18 U.S.C., §§ 1363, 1368, 1991; Me. Rev. Stat. tit. 17, §§ 2401, 2402; Mass Gen. Laws ch. 266, §§ 1, 12 112, 129; N.H. Rev. Stat. Ann. §§ 154:13, 270:26-a, 384:22-a; R.I. Gen. Laws §§ 11-35-4, 11-36-9, 11-44-8, 11-44-31.

Second, even accepting the majority's observation as fact, the majority seems to claim that such a redundancy internal to § 46507(1) somehow creates a problem vis-à-vis the civil penalty.  Yet, that civil penalty, of course, requires neither "willful" nor "malicious" action, see 49 U.S.C. § 46302, and the legislative history the majority cites indicates that Congress thought deleting the term "willful" from the civil penalty in the analogous Bomb Hoax Act made a difference, see Maj. Op. at 13.  Thus, even if "willful" and "malicious" meant the same thing under the common law -- which they do not -- any redundancy within § 46507(1) still creates no overlap with § 46302 that would necessitate looking beyond the common law for a definition of "malice."

-30-

Supreme Court has consistently instructed that the grounds for inferring any alternative intent by Congress must come from the face of the statute, the definitions the statute provides, and any other, related provisions. See, e.g., Neder, 527 U.S. at 24 n.7 (noting that "rebuttal" of a common law meaning "can only come from the text or structure of the . . . statutes themselves"); Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 322-23 (1992) (noting that "a court must infer, unless the statute otherwise dictates" that Congress intends to apply the common law meaning, finding ERISA's statutory definition of "employee" "completely circular," and then applying the settled common law definition because in "the rest of the Act" the Court found no "provision either giving specific guidance on the term's meaning or suggesting that [applying the common law meaning] would thwart the congressional design or lead to absurd results" (emphasis added)). Congress chose to employ the term "maliciously" in § 46507(1) but provided no definition of that term in the statute. Presumably Congress was aware that "malice" had a settled and storied meaning under the common law. Thus, absent the majority's illusory "redundancy" or any other indication in the statute to depart from the settled common law meaning, there is no need or justification to look to the legislative history.

Moreover, I am not convinced that the Attorney General's passing use of the phrase "evil or reckless motive," even if

-31-

relevant, can bear the weight the majority places on it. It is not at all clear that the Attorney General's informal account of the practical realities that necessitated a change to the Bomb Hoax Act was intended to describe the full reach of the term "willfully and maliciously" as used in the statute. We should give Congress the benefit of the term it actually chose to employ, but left undefined, even if that term reaches father than the situations the Attorney General described. And it is worth noting that malice, in the legal sense, has never required a showing of "hatred, spite, grudge, or ill-will." Kelly, 676 F.3d at 918 (quoting Perkins & Boyce, supra, at 857); accord Black's, supra, at 1100 (noting that defining malice as "[i]ll will" or "wickedness of heart" is "most typical in non-legal contexts").

Thus, contrary to the majority, I conclude that the settled common law definition, requiring a two-pronged showing that the defendant intentionally committed a "wrongful act" and did so "without justification, excuse, or mitigation," Serawop, 410 F.3d at 664, is the one Congress intended us to apply in § 46507(1).[17] And the district court's instructions below comported with that settled common law meaning. Although perhaps not perfect, the district court's charge that the jury must find Gray "d[id]

_____

[17] An intent to do the wrongful act may not always be necessary, either. An act might, instead, be done with sufficient disregard for the foreseeable harm that is likely to result such that it is considered malicious. See Kelly, 676 F.3d at 918 n.6; Charles v. United States, 371 A.2d 404, 411 (D.C. 1977).

-32-

something that is knowingly wrong" with an "evil purpose or improper motive" adequately conveyed the common law definition of malice. I do not see how the district court's inclusion of the word "improper" the second time that it provided the instruction -- such that the jury might have found malice if it concluded Gray had an "evil purpose" <u>or</u> an "improper motive" -- in any way watered down the government's burden under the statute.[18] An "improper" motive or purpose equates with a lack of justification or excuse; in other words, having a justification or excuse for making a false bomb threat would perhaps supply a <u>proper</u> purpose or motive. And, I am less troubled than the majority appears to be that, by concluding a defendant acts maliciously when she has an improper motive, we will sweep in the entire "universe of things that are considered improper," such as "wearing a hat indoors." <u>Maj. Op.</u> at 20-21. To find malice, the jury always must conclude that the defendant has also taken an intentional, wrongful action (presumably one that has been statutorily proscribed).

Gray's confession conclusively demonstrates that she acted intentionally, knowing her action was wrong, and without any justification, excuse, or mitigation. She admitted to making the

---

[18] Although used in a civil, not criminal, context, I find it particularly informative that the term "improper motive" explicitly has been used to describe the showing of malice necessary for torts like malicious prosecution. <u>See</u> <u>Smith</u> v. <u>Wade</u>, 461 U.S. 30, 53 (1983) (noting that malicious prosecution requires a showing of "improper motive" of the tortfeasor); <u>id.</u> at 60 n.3, 78 n.12 (Rehnquist, J., dissenting) (noting the same and collecting cases).

bomb threat in the hopes of getting ground workers in trouble and she stipulated that she was aware that an American Airlines flight had been grounded previously due to a similar bomb threat found in an airplane lavatory.  It sets the bar far too high to require the government to show that a defendant harbored an "evil intent" -- against her airline employer or anyone else -- in order to prosecute that individual for making a false bomb threat that necessitated the grounding and evacuation of an aircraft and the response of emergency personnel.  Indeed, whatever the proper common law definition of malice, one would think that making a false bomb threat merely to cause some "benign mischief" for a co-worker is sufficiently malicious to sustain Gray's conviction.  Cf. Doe, 136 F.3d at 635 n.4 ("'An intentional act creating an obvious fire hazard to the dwelling of another, done without justification . . . would certainly be malicious.'" (quoting Perkins & Boyce, supra, at 275)).

To its credit, the majority's opinion provides a clear definition of malice in the context of 49 U.S.C. § 46507(1) for the district court to apply on remand. In the face of some disagreement among courts, such clarity is admirable.  But where we can properly discern the settled common law definition, we must assume Congress incorporated it and then faithfully apply it.  If Congress wishes to depart from that common law meaning it can clarify its use of the term in this or a future statute.  Because there is no

indication in the statute that Congress intended to do so here, however, and since the common law definition is sufficiently clear, I respectfully dissent.